**KIRAKOSIAN LAW, APC**
GREG L. KIRAKOSIAN   SBN 294580
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TEL: (213) 986-5389
FAX: (213) 477-2355
[GREG@KIRAKOSIANLAW.COM]

Attorneys for Plaintiffs, *ESTATE OF ANTHONY SODERBERG, and SHIRLEY SODERBERG*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ATHONY SODERBERG; and SHIRLEY SODERBERG, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> LOS ANGELES POLICE DEPARTMENT, a public entity; JOSEPH GOOSBY, an individual; DAVID KEORTGE, an individual; JUAN FLORES, an individual; ROBERT GALLEGOS, an individual; JONATHAN PULTZ, an individual; MARIO RIOS, an individual; JERRY FRITZ, an individual; BILLY LEE, an individual; CLIFF CHU, an individual; CANAAN BODELL, an individual; GREGORY MARTIN, an individual; MICHAEL MESSENGER, an individual; JEREMY ESCAMILLA, an individual; and DOES 1 through 50, inclusive, <br><br> Defendants. | **CASE NO.: 2:18-CV-3861-FMO-JPR** <br><br> *Assigned to Hon. Fernando M. Olguin 1st Street Courthouse – Ctrm. 6D* <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES:** <br><br> 1. **VIOLATION OF CIVIL RIGHTS – EXCESSIVE FORCE;** <br> 2. **VIOLATION OF CIVIL RIGHTS – WRONGFUL DEATH;** <br> 3. **VIOLATION OF CIVIL RIGHTS – *DEVEREAUX CLAIM*;** <br> 4. **VIOLATION OF CIVIL RIGHTS – *MONELL CLAIM*;** <br><br> **DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      This action arises out of Civil Rights violations, 24 U.S.C. § 1983 et seq., seeking compensatory and punitive damages against Defendants the Los Angeles Police Department, Defendant Officers Michael Messenger, Robert Gallegos, David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee, DOE Officer 1, DOE Officer 2, and DOE Officer 3 (Collectively "Defendant Officers"). This action against Defendant Officers arises from their conduct of using unreasonably excessive and deadly force under color of state law which resulted in the officer-involved shooting and wrongful death of Anthony Soderberg ("Soderberg") on May 8, 2017.

2.      Defendants named herein as Defendants and DOE Officers 1 through 30 ("DOE Officers") proximately caused Soderberg's death and Plaintiff's injuries by firing the shots that caused the unnecessary and untimely death of Soderberg, by integrally participating or failing to intervene in the shooting, and by engaging in other acts and/or omissions around the time of the shooting that resulted in Soderberg's death. Defendants and DOE Officers are directly liable for Plaintiff's injuries under federal law pursuant to 42 U.S.C. § 1983.

3.      Defendants the LOS ANGELES POLICE DEPARTMENT, the CITY OF LOS ANGELES (Collectively "LAPD"), DOE Officer 31 and DOES 32 - 50 also proximately caused Soderberg's death and Plaintiffs' injuries and are liable under state law and under principles set forth in *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658 (1978).

**JURISDICTION AND VENUE**

4.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. This Court has jurisdiction over the entire action by virtue of the fact that this is a civil action wherein the matter in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of the

Court. This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## PARTIES

5.     At all relevant times, ANTHONY SODERBERG was an individual residing in the City of Los Angeles, California, in the Central District of California.

6.     Plaintiff SHIRLEY SODERBERG ("SHIRLEY") is an individual residing in the City of Los Angeles, State of California and is the natural mother of Anthony Soderberg. SHIRLEY sues both in her individual capacity as the mother of SODERBERG and in a representative capacity as a successor-in-interest to SODERBERG. SHIRLEY seeks both survival and wrongful death damages.

7.     Defendant THE CITY OF LOS ANGELES ("CITY") is, and at all relevant times was, a governmental entity organized and existing under the laws of the State of California. At all relevant times, Defendant THE LOS ANGELES POLICE DEPARTMENT ("LAPD") is, and was, a law enforcement agency for the City of Los Angeles, responsible for the training and supervision of its police officers, including DOES 1 through 50. Defendants CITY and LAPD are responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including and its agents and employees. At all relevant times, Defendants CITY and LAPD were responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the and its employees and agents complied with the laws of the United States and of the State of California. At all relevant times, CITY and LAPD were the employers of Defendants DOES 1 through 50.

8.     Defendant OFFICER JOSEPH GOOSBY, identified in the Board Of Police Commissioners ("BOPC") report as Officer X ("Officer Joseph Goosby"), is,

and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Goosby was acting in the course and scope of his employment and under the color of state law.

9.      Defendant OFFICER JUAN FLORES, identified in the BOPC report as Officer BB ("Officer Juan Flores"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Flores was acting in the course and scope of his employment and under the color of state law.

10.      Defendant OFFICER ROBERT GALLEGOS, identified in the BOPC report as Officer M ("Officer Robert Gallegos"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Gallegos was acting in the course and scope of his employment and under the color of state law.

11.      Defendant OFFICER MICHAEL MESSENGER, identified in the BOPC report as Officer L ("Officer Michael Messenger"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Messenger was acting in the course and scope of his employment and under the color of state law.

12.      Defendant OFFICER JONATHAN PULTZ, identified in the BOPC report as Officer CC ("Officer Jonathan Pultz"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Pultz was acting in the course and scope of his employment and under the color of state law.

13.      Defendant OFFICER MARIO RIOS, identified in the BOPC report as Officer T ("Officer Mario Rios"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Rios was acting in the course and scope of his employment and under the color of state law.

14.     Defendant OFFICER JERRY FRITZ, identified in the BOPC report as Officer HH ("Officer Jerry Fritz"), is, and at all relevant times was, and individual residing in the County of Los Angeles, State of California. At all relevant times, Officer Fritz was acting in the course and scope of his employment and under the color of state law.

15.     Defendant OFFICER GREGORY MARTIN, identified in the BOPC report as Officer GG ("Officer Gregory Martin"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Martin was acting in the course and scope of his employment and under the color of state law.

16.     Defendant OFFICER DAVID KEORTGE, identified in the BOPC report as Officer N ("Officer David Keortge"), is, and at all relevant times was, and individual residing in the County of Los Angeles, State of California. At all relevant times, Officer Martin was acting in the course and scope of his employment and under the color of state law.

17.     Defendant OFFICER JEREMY ESCAMILLA, identified in the BOPC report as Officer MM ("Officer Jeremy Escamilla"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Escamilla was acting in the course and scope of his employment and under the color of state law.

18.     Defendant OFFICER CANAAN BODELL, identified in the BOPC report as Officer LL ("Officer CANAAN BODELL"), is, and at all relevant times was, and individual residing in the County of Los Angeles in the State of California. At all relevant times, Officer Bodell was acting in the course and scope of his employment and under the color of state law.

19.     Defendant OFFICER BILLY LEE, identified in the BOPC report as Officer JJ ("Officer Billy Lee"), is, and at all relevant times was, and individual residing in the County of Los Angeles, State of California. At all relevant times, Officer Lee was

acting in the course and scope of his employment and under the color of state law.

20.     Defendant OFFICER CLIFF CHU, identified in the BOPC report as Officer U ("Officer Cliff Chu"), is, and at all relevant times was, and individual residing in the County of Los Angeles, State of California. At all relevant times, Officer Chu was acting in the course and scope of his employment and under the color of state law.

21.     Plaintiffs allege that DOES 1 through 30 were law enforcement officers (" DOE Officers") acting under the color of state law. It is further alleged that DOES 1 through 30 are residents of the County of Los Angeles and were acting in the course and scope of their employment at all relevant times. DOE Officers were acting with the complete authority and ratification of their principal, Defendant CITY and LAPD.

22.     Defendants DOES 31 - 50 are supervisory officers for the CITY who were acting under color of law within the course and scope of their duties as officers for the Los Angeles Police Department. DOES 31 - 50 were acting with the complete authority and ratification of their principal, Defendant CITY.

23.     Defendants DOES 31 - 50 are managerial, supervisorial, and policymaking employees of the LAPD, who were acting under color of law within the course and scope of their duties as managerial, supervisorial, and policymaking employees for the Los Angeles Police Department. DOES 31 - 50 were acting with the complete authority and ratification of their principal, Defendant CITY.

24.     Defendants DOES 31 through 50, were duly appointed LAPD Sergeants, Lieutenants, Captains, Commanders, executives and/or policymakers of the CITY and LAPD, a department and subdivision of defendant CITY, and at all times mentioned herein said defendants were acting in the course and scope of their employment with defendant CITY which is liable under the doctrine of respondent superior pursuant to section 815.2 of the California Government Code.

25.     In doing the acts and failing and omitting to act as hereinafter described, Defendant Officers were acting on the implied and actual permission and consent of Defendants LAPD and DOES 31 - 50.

26.    Defendant DOES 31 - 50 are sued herein because they were and are responsible for maintaining, creating, and ratifying unconstitutional practices and policies which caused Plaintiffs' injuries; and because their inaction, their failure to change policies, and failure to implement correct police procedures, policies, and adequate training of Los Angeles Police officers has manifested a reckless and callous indifference to Civil Rights violations, and which caused the constitutional injuries suffered by Plaintiffs. Defendant DOES 31 - 50 are also sued because they set in motion a series of acts by LAPD officers by his failure to implement proper training and tactics for Police officers in dealing with and interacting with residents of the City of Los Angeles. Said failures by DOES 31 - 50 caused the constitutional injuries suffered by Plaintiffs. Individual liability is sought against Defendant DOES 31 - 50 because they enforced the official policy, practice, and custom of the defendant CITY OF LOS ANGELES of condoning, approving, and ratifying constitutional violations and excessive use of force against the residents of the City of Los Angeles. DOES 31 - 50 are also sued in because they have been on notice that the training of officers has been deficient in the areas of use of force, proper police tactics, and proper police procedures designed to preserve life. Proper police procedures and proper police tactics were not in place in the CITY OF LOS ANGELES; the training of officers had deteriorated, was defective, needed improvement; and that the failure to follow proper police tactics and the failure to provide proper training of officers was reckless and dangerous for the residents of Los Angeles. The inadequate training of police officers by Defendants CITY and DOES 31 - 50, and the failure to properly train officers amounts to reckless and deliberate indifference to the violation of Civil Rights of the residents of the City.

27.    The true names and/or capacities, whether individual, corporate, associate or otherwise of Defendant DOES 1 through 50 are unknown to Plaintiffs at this time and therefore Plaintiff files this Civil Rights Complaint against said DOE Defendants by such fictitious names. Plaintiffs will seek leave of Court to amend this complaint when the true names and capacities of said DOE Defendants are ascertained.

28. Defendants DOES 1 through 50, were duly appointed police officers, Sergeants, Lieutenants, Captains, Commanders, executives and/or policymakers of the LAPD, a department and subdivision of defendant CITY OF LOS ANGELES, and at all times mentioned herein said defendants were acting in the course and scope of their employment with defendant CITY OF LOS ANGELES which is liable under the doctrine of respondent superior pursuant to section 815.2, 820, and 820.8 of the California Government Code.

29. Plaintiffs are informed and believes that each Defendant and Defendants sued herein as DOES 1 through 50 are contractually, strictly, vicariously liable and/or otherwise legally responsible in some manner for each and every act, omission, obligation, event or happening set forth in this Complaint.

30. The use of the term "Defendants" or "officers" in any of the allegations of this Complaint, unless specifically set forth as otherwise, is intended to include and charge both jointly and severally, not only named Defendants, but all Defendants designated as DOES 1 through 50 as well.

31. Plaintiffs are informed and believe and thereon allege that at all relevant times each of the Defendants and DOE Defendants, in addition to acting for himself, herself, or itself and on his, her, or its own behalf, is and was acting as the agent, servant, employee and representative of, and with the knowledge, consent, and permission of each and all of the Defendants.

32. Plaintiffs further allege that the acts of each of the Defendants were fully ratified by each and all other Defendants. Specifically, and without limitation, Plaintiffs allege on information and belief that the actions, failures to act, and breaches alleged herein are attributed to one or more of the Defendants were approved, ratified, and done with the cooperation and knowledge of each and all of the other Defendants.

33. SODERBERG died as a direct and proximate result of the actions of the CITY and DOES 1 through 50. Defendants are directly liable for Plaintiff's injuries under federal law pursuant to 42 U.S.C. § 1983.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

34.    Plaintiffs repeat and re-allege each and every allegation in preceding paragraphs of this Complaint as if fully set forth herein.

## THE INTIAL RESPONSE

35.    On May 8, 2017, at approximately 9:00 a.m., a woman residing at 11362 Alethea Drive, Sunland, CA 91040, called 911 to report that an unknown individual had entered her house. She reported that she had been sleeping when she was awakened by the sound of a conversation outside her bedroom. She stepped out of the bedroom and observed the unknown individual, later identified as Anthony Soderberg, standing near her dining room table talking to himself and referencing Jesus. Soderberg asked the woman if she had any cookies. She advised the 911 dispatcher that he appeared to be under the influence or possibly mentally ill. She also advised that she had fled the residence through her bedroom window and was now safely outside without any incident or any threats or acts of violence from Soderberg.

36.    Initially, four uniformed LAPD Officers from the Foothills Division responded to the radio call of a "hot prowl" burglary. A "hot prowl" is a term used in law enforcement to describe a subtype of burglary in which the occupant or victim remains inside the residence. Generally, a "hot prowl" involves the possibility of a hostage situation or the intruder harming the resident inside the home. **However, in this case, the situation should neither have been broadcast nor responded to as a "hot prowl" since there were no residents left inside the home when the 911 call was made, a circumstance the responding officers would have been advised of prior to their arrival.** While en route to the scene, the officers requested air support, and an LAPD helicopter was dispatched to the area.

37.    In reality, the situation at that point was something less than a burglary since Soderberg had committed no known crime once inside the residence. It was nothing more nor less than a mentally ill and hungry individual who had trespassed on private property in search of food. The female resident did not accuse Soderberg of

entering the home with any weapons; she did not accuse him of committing any crime; and she did not accuse him of becoming aggressive or making any attempt to attack or harm her.

38.     When the officers arrived—by then a male co-resident had arrived—they were advised that there were three weapons in the house; a handgun, shotgun, and a rifle. The male resident advised that the shotgun was well hidden in a closet; the rifle was in a locked case with the key hidden inside a drawer; and the handgun was unloaded, on a shelf, along with a loaded ten-round magazine. **As such, Soderberg would have access only to a handgun and a single magazine**. The female resident also made clear that she did not see Soderberg in possession of any weapon.

39.     The foregoing facts, including the fact that Soderberg was alone in a residence, was mentally ill—he was talking to himself and referencing Jesus—had not committed any violent acts, and had access only to an unloaded handgun, should have had a significant influence on the officers' evaluation of the level of threat, if any, Soderberg posed. At no time did Soderberg fire upon or threaten to fire upon the uniformed officers were initially responded to the residence.

40.     Thereafter, two more uniformed LAPD Officers and a uniformed sergeant arrived on-scene. The sergeant established a Command Post and acted as temporary Incident Commander. The LAPD helicopter also arrived overhead. Despite knowing that Soderberg suffered from some type of mental health issues, the Sergeant coordinated efforts to get Soderberg to exit the residence by having Officers on the perimeter shout commands at Soderberg to exit. The Sergeant also requested that the air unit fly over the residence and use their Public Address system to command Soderberg to exit. The officers were able to see Soderberg inside the residence through a window. At that time he had not picked up the handgun and was refusing to exit the residence. **There were now seven uniformed LAPD officers on-scene and an LAPD helicopter overhead**.

41.     The on-scene sergeant notified the LAPD watch commander, also a sergeant, that Soderberg had barricaded himself inside the house with access to weapons. The watch commander responded to the scene and took command of the incident response. After evaluating the situation and concurring that the incident met the criteria for a "barricaded suspect with access to weapons," he advised an LAPD lieutenant who was not on-scene of the situation. The lieutenant advised an LAPD captain of the situation and requested that a second LAPD helicopter be deployed, this one equipped for aerial platform shooting ("APS") by police snipers. The reasons given by the lieutenant for needing the APS, as later reported by Chief Beck in his summary report of the incident, included the following:

> *"A challenging position to contain due to Soderberg being in an elevated position at the end of a cul-de-sac in hilly terrain."*

> *"In a tactical position of advantage due to elevation, with access to numerous ravines to escape into the surrounding community."*

> *"Had a full advantage and a 360-degree view of the officers down below."*

> *"In a position where it would be very dangerous for anybody to try to contain or engage him on foot."*

42.     This evaluation by the lieutenant, as reported by Chief Beck, is patently false. At no time did Soderberg ever have a 360-degree view of the officers. He had no possible route of escape, and at no time did he ever have a tactical advantage, especially while armed only with a handgun.  In reality, the residence was very easily contained by LAPD Officers and none of the Officers were ever in any tactically-inferior position. On three sides of the residence, including the side where the responding Officers initially approached, the LAPD Officers were never at a lower elevation. On the north side of the house was a ravine, but its terrain actually worked to the officers' advantage. As is apparent from video and photographs of the residence, there is limited vegetation in the ravine, and at the bottom is the natural barrier of a major paved road.  Two officers could easily have contained the entire north side of the house, including the ravine, from

that road. The officers could also have taken an elevated position on the west side of the house, but it wasn't necessary since they easily contained that side of the house from the area of the driveway and detached garage.

43.     The captain forwarded the APS request to an LAPD commander, who gave approval for its deployment. At the same time, the deployment of the LAPD's Metropolitan Division S.W.A.T. unit was approved. Once the lieutenant and the S.W.A.T. officers arrived on-scene, incident command was handed over to the captain in charge of the S.W.A.T. unit. **There were now at least 26 LAPD officers on-scene, at least two LAPD "Bearcat" armored personnel carriers, an LAPD helicopter overhead, and a second APS-equipped helicopter en route.**[1] The S.W.A.T. officers, hereafter referred to as the "Defendant officers," included, but is not limited to, the following: Michael Messenger (APS sniper), Robert Gallegos (APS sniper), David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee; and DOE Officers.

44.     Also, now on-scene were members of an LAPD crisis negotiation team, which included 2 officers, a sergeant, and a staff psychologist.

## THE TACTICAL RESPONSE

45.     Once the Defendant officers, as well as other unidentified officers from the Metropolitan Division, were in place, the uniformed officers from the Foothills Division were relieved of their containment duties. The perimeter that was established included S.W.A.T. officers positioned at 50-feet or less on three sides of the house, as well as along the paved road on the north side of the residence at the bottom of the ravine. All officers were armed with high-powered assault rifles. Also, at the scene were tactical emergency medical personnel from the Los Angeles Fire Department. It is unknown how many of the uniformed officers who initially responded remained at the scene once it was handed over to the S.W.A.T. commander.

46.     The initial step taken by the special units was an attempt by the crisis negotiation team ("CNT") to make contact with Soderberg and negotiate a peaceful resolution. **At this point, no shots had yet been fired by Soderberg, and there was no evidence that he had armed himself with the handgun**. The CNT attempted to make contact with a cell phone inside the house, but that effort was unsuccessful. They then attempted to establish contact with a bullhorn, again with no luck. At one point, Soderberg was observed beginning to step outside through a window, but immediately stepped back inside when confronted by officers. While the CNT continued its efforts, an unidentified S.W.A.T. officer (Officer G) remotely maneuvered a robot equipped with a camera and public-address system to the southwest corner of the house—the Bearcat was parked parallel to the west side of the house in the driveway—to peer in through a window. Once the robot was in place, DOE Officer, Identified as Officer G in the BOPC report, commanded Soderberg through the robot's P.A. system to exit the residence.

47.     At this point the CNT, as well as the staff psychologist, were well aware that Soderberg was a homeless individual who suffered from a mental illness and thought disorder—based on the description provided by the resident—which is almost always accompanied by some degree of paranoia. It was the duty of the LAPD psychologist to inform the incident commander of the difficulty they would have building rapport with such an individual with such an menacing show of tactical force in close proximity to the house, especially the robot and helicopter. Steps should have been taken to pull back the robot, to order the helicopter to leave the area, and to move the officers away from the house as far as possible without compromising their containment perimeter. Making matters worse, Officer G, who was not part of the CNT, was now continuously shouting commands at Soderberg. **Only the lead negotiator should have been attempting to communicate with Soderberg.**

48.     At this point, Soderberg purportedly fired a single shot at the robot but did not hit it. DOE Officer, identified as Officer G in the BOPC report, as well as DOE

Officer 1 and Officer Mario Rios—all of whom were positioned behind the Bearcat—reported later that after Soderberg fired, he was heard yelling "[expletive], everybody dies!" Officer Cliff Chu, a trained negotiator, but not part of the CNT, then attempted to communicate with Soderberg through the same robot's P.A. system. Again, Soderberg purportedly fired through the window in the direction of the robot. One more attempt by Officer Cliff Chu had the same effect. **Following the incident, four empty casings were found in the area where Soderberg purportedly fired from. The bullet trajectories, which were found to have taken a path through the window sill, confirmed that Soderberg was firing only in the direction of the robot which had been shouting commands.**

49.     After the shots at the robot (total of 4), the CNT abandoned its efforts, and the incident commander approved the introduction of CS gas in an effort to force Soderberg from the residence. The decision was made to use "ferret" rounds, which release CS in either powder or liquid form. The benefit of this method is that the CS does not burn and is non-flammable. Thirty such rounds were ultimately fired into the residence by Officer W, and in a short amount of time, Soderberg exited from the kitchen door on the northwest side of the residence.

**<u>SODERBERG'S FIRST EXIT FROM THE HOUSE</u>**

50.     According to Officers David Keortge and Juan Flores, as well as DOE Officers identified as Officers Z and AA in the BOPC report , when Soderberg exited on the north side of the house, he was armed with the handgun, and was holding it in the "high ready" position as he moved with his chest against the house toward the northwest corner. With the exception of Officer Flores, once Soderberg rounded the corner of the house—he would have then had an unobstructed view of the LAPD Bearcat in the driveway—the other three officers either observed or heard Soderberg fire the gun multiple times in the direction of the Bearcat. DOE Officer 1, who was positioned behind the Bearcat, reported that he observed Soderberg round the corner and fire in his direction. DOE Officer, identified as Sergeant C in the BOPC report, also

positioned behind the Bearcat, did not see Soderberg fire, but did hear his shots. DOE Officer 1 fired at Soderberg 6 times but did not hit him. **However, the investigation revealed that no empty casings from Soderberg's weapon were found in that location, confirming that he had neither fired in the direction of the Bearcat, nor in any other direction at that point.** It was also later confirmed that DOE Officer 1 had struck his own vehicle with some of his own shots - not any shots from Soderberg. Officer O's reports that he saw Soderberg firing were false.

51.    After being fired upon six times by DOE Officer 1, Soderberg ran back toward the kitchen door, before he re-entered the house, he was observed firing the handgun overhead into the sky. Three empty casings were later found in this location, however no bullet strikes were discovered on the helicopter. Soderberg then re-entered the house through the kitchen door. At this point, only Officer O had fired at Soderberg, and Soderberg had fired only at the robot (4 rounds) and into the air (3 rounds).

52.    Once Soderberg was back inside, DOE Officer, identified as Officer W in the BOPC report, continued to fire the Ferret rounds into the house. At this point the APS air unit returned to the ground to conserve fuel. At the same time, DOE Officer, identified as Commander B in the BOPC report, arrived on-scene to take command. A request was made to use "hot gas" in an effort to drive Soderberg back outside. Hot gas is CS in gaseous form, and is highly flammable and dangerous, especially when deployed in an enclosed area. Commander B approved its use, and an LAFD helicopter equipped for water-dropping was deployed in the event the house caught fire.

53.    At this time, DOE Officer 31, a commander identified as "10-David", broadcast what amounted to a shoot-to-kill order. At least two officers described the dispatch as *"we cannot let this individual get to another structure or escape containment."* To a police officer, such an order from a commander is exactly that, a shoot-to-kill order. Such an order relieves them of their duty and legal obligation to properly evaluate the level of threat before using any force, especially deadly force. Plaintiffs are informed and believe that DOE Officer 31 did not instruct all Officers to

take into account Soderberg's threat or anything, and essentially ordered all Officers to take any means - including the use of deadly force - to prevent Soderberg from leaving the residence or entering any other part of the residence.   To any Officer, DOE OFFICER 31's orders are what can only be described as a "shoot-to-kill" order.  As a result of DOE Officer 31's "shoot-to-kill" order, Defendant Officers no longer evaluated the risks or threats posed by Soderberg, and were following DOE Officer 31's explicit instructions to take all necessary means - including the use of deadly force - to prevent Soderberg from leaving the residence or breaking containment.

54.   Immediately after the "shoot-to-kill" order was provided by DOE Officer 31, Defendant Officers Michael Messenger (APS sniper), Robert Gallegos (APS sniper), David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee; and DOE Officers 1 and DOE Officer 2 all indiscriminately fired upon the unarmed Soderberg with the use of deadly force, regardless of whether or not he truly posed a threat to any Officer or the public, without having a view of Soderberg, without any reasonable or justifiable evidence if he was truly armed or not.  The facts of the Officer Involved Shootings ("OIS") are as follows:

**SODERBERG'S SECOND EXIT FROM THE HOUSE**

55.   As was expected by the officers, once the hot gas was deployed, as well as two sting grenades at the same time, Soderberg exited through the same kitchen door at approximately 1:08 p.m.  **At this time, Soderberg was unarmed. The gun was later found inside the house where he left it behind when he exited the second time**. DOE Officer, identified as Officer Z in the BOPC report, who, via the robot's video monitor, observed Soderberg exit the house and onto the patio, stated that he saw the gun in Soderberg's right hand. DOE Officer, identified as Officer AA in the BOPC report, who was in the same position as Officer Z, broadcast over his radio *"here he comes. He's coming again. He's got his hand in his waist."* At this time the APS unit became airborne and returned to the scene.

**OIS: Officers Joseph Goosby and Juan Flores**

56.     At approximately 1:48 p.m., approximately forty minutes after Soderberg had discarded the weapon and left the residence, Defendant Officer Goosby was positioned in the breezeway of the converted garage area and was designated to cover the corner of the residence.  Defendant Officer Juan C. Flores was positioned inside the detached garage.

57.     Both Defendant officers Joseph Goosby and Juan Flores reported to have observed Soderberg to have been running away from their location (eastward) on the patio and then turning and extending his arm toward them with a "dark object" in his right hand.  At that time,  upon seeing Soderberg, Officer Goosby fired a total of four rounds upon the unarmed Soderberg with his rifle from a distance of approximately 40 feet.  Nearly simultaneously, Officer Flores fired two rounds upon Soderberg with his rifle from a distance of approximately 40 feet. **At the time Officers Goosby and Flores fired, Soderberg was unarmed, had been unarmed for approximately 40 minutes, and was unable to have been armed as he had not reentered the residence**. It is unknown how many times the unarmed Soderberg was hit by Officers Goosby and Flores, but Plaintiffs are informed and believe that they struck Soderberg.

**OIS: Officers Robert Gallegos and Michael Messenger (APS Snipers)**

58.     As Goosby and Flores fired, the APS helicopter came into view overhead at a distance of approximately 250 to 300 feet away from Soderberg's position. Officers Gallegos and Messenger, the two snipers on board, both stated, **even though trees were partially blocking their view of Soderberg and they were approximately 250 to 300 feet away**, they observed either a gun (Gallegos) or something dark (Messenger) in Soderberg's hand as he was being fired upon by Goosby and Flores. First, Officer Gallegos fired several rounds (between five to seven) downward at the Soderberg's torso from his rifle from an approximate distance of approximately 250 to 300 feet and then stopped.  Officer Messenger reported that he witnessed Soderberg get struck by Officer Gallegos' volley of gunfire.  Nonetheless, Officer Messenger fired one round from his

rifle at Soderberg's torso from an approximate distance of approximately 250 to 300 feet. As Officer Messenger fired his shot, Officer Gallegos reported to have shot several more rounds at Soderberg. Gallegos fired at Soderberg a total of 14 times. Messenger fired once. Soderberg fell to the patio, but was able to crawl inside a shed attached to the east side of the house. **He had been shot at 21 times while on the patio and at a time when he was unarmed. It is unknown how many times he was shot.**

## SODERBERG'S THIRD EXIT FROM THE HOUSE

59.    Immediately after Defendant officers Gallegos and Messenger fired upon the unarmed Soderberg from their airship, it was reported that Soderberg crawled into a doorway of a partially enclosed shed that appeared to be under construction. Officers observed by way of a robot that Soderberg had been injured, lying on his left side, his eyes were opening and closing, he was covered in blood, but still alive.  Soderberg was now lying inside a shed unarmed, shot multiple times, and having been subjected to hot gas and a sting grenade. He was no doubt frightened, disoriented, and in severe pain from the gunshots and the burning hot gas. At this point a second robot was deployed to peer into the shed. Unbelievably, DOE Officer, identified as Sergeant C in the BOPC report, believed Soderberg might be lying in wait to do harm to the officers, so he ordered that another sting grenade be deployed. **Officer Juan Flores threw a sting grenade into the shed and it exploded near Soderberg's feet, causing even further injury at a time when he was unarmed and had already been shot multiple times.**

60.    At this time a second APS air unit was deployed, making a total of 4 helicopters that had been deployed during the incident. As Soderberg lay inside the shed wounded, a team of officers moved inside the house and approached a window of the shed that opened to the living room of the house. The officers included Flores, Chu, Goosby, Keortge, and Officers Z and AA. After breaking the window, Officer Keortge threw in another sting grenade. At the same time, Officer Flores deployed another canister of hot gas.

61.     The Communications Division recording captured the following broadcasts by an Officer: "The stinger is in. He's moving around. He's looking toward the window. He's up on his butt. He's gonna scoot out. Alright, he is on the corner sitting up. The gas is affecting him. He -- he's screaming, trying to get away from the gas."

62.     At this time, Soderberg was unarmed, badly wounded, and moving only his head. At approximately 2:39 p.m., when a sting grenade exploded, Soderberg immediately exited the shed and fell onto the ground outside.  Several Defendant Officers and other LAPD Officers observed the Soderberg crawling out of the smoky gas filled shed, rolling from his injuries, and struggling to breath.

**OIS: Officers Mario Rios and Jonathan Pultz**

63.     Defendant Officer Rios also observed Soderberg crawling out of the shed and reported that, "[Soderberg] looked in my direction and he continued to have that -- tight fist with his right hand, and he placed his left hand on the cement or concrete and rolled in -- in my direction and my partner's direction, and I saw the barrel of a gun, and that's when I engaged."  Officer Mario Rios fired one round from his rifle at Soderberg from an approximate distance of 50 feet. According to Officer Mario Rios, he observed his rounds strike Soderberg.

64.     At approximately the same time that Defendant Rios fired and struck Soderberg, Defendant Officer Jonathan Pultz also fired upon the unarmed Soderberg. Officer Jonathan Pultz reported that after the gas was deployed, he heard yelling then observed the Soderberg crawling out of the shed. Defendant Officer Pultz reported that Soderberg exited the shed and "landed with his right arm, like, underneath his shirt and his waistband, as if he was holding a pistol, and landed on his knees and his -- and his left -- left arm. So, as he did that, he turned toward us and he brought his hand from underneath his waistband and he had it -- his hand, like, in a pistol grip, holding a dark object." Officer Jonathan Pultz added to his report, "[Soderberg] immediately looked in our direction and then started to turn and then brought that hand out from underneath holding a dark object, I believe was a gun." According to Officer Jonathan Pultz, he

feared for his life, as well as the lives of his partners, and fired two rounds from his rifle at the Soderberg from an approximate distance of 50 feet. Officer Jonathan Pultz believed he struck the Soderberg as well.

### **OIS: Officers Jerry Fritz, DOE Officer 2, and Gregory Martin**

65.     Immediately after Officers Mario Rios and Jonathan Pultz fired and struck Soderberg, he was severely wounded, struggling, crawling, and ultimately fell over the retaining wall and down a six-foot drop.  After hitting the grown, Soderberg rolled down the steep incline of the ravine.

66.     As Soderberg was taking on gunfire and falling over the six-foot retaining wall and rolling down the steep incline of the ravine, Gregory Martin, Officer Jerry Fritz, and DOE Officer 2 were watching from the roadway approximately 600 feet away.  **Despite being 600 feet away, Officers Martin,  Fritz, and DOE Officer 2 all reported that they believed Soderberg was trying to escape, had a "dark object" in his hand, to be in fear of their lives, and fired at total of eight rounds upon the unarmed Soderberg.**

67.     Defendant Officer Gregory Martin reported that he heard gunfire upon Soderberg and then saw him slide over the edge of the retaining wall and fall into the ravine.  Officer Martin reported that "[Soderberg] was coming down sideways, eft side first, with his hand out kind of balancing himself."  Although Officer Martin was approximately 600 feet away from Soderberg, and Soderberg hadn't been armed for over an hour and thirty minutes, he reported that "I could see his right hand. Something dark, but I couldn't tell if it was a weapon or not... So I could not see his right hand and I could not see exactly what was in his right hand. He surfed, if that's what you want to call it, down the mountain for maybe 10 to 12 feet… But as he slid down, now I could see that he was looking back at the officers that were above him. At that point, I immediately feared that another engagement was going to reoccur because he did have what I believed to be a gun in his hand…. At that point, I decided to use lethal force… And I fired one round…" Defendant Officer Martin reported that he then observed

Soderberg to continue sliding down the hillside "[a]nd it still looked like he had something in his hand. And believing that he still -- still had the firearm from before, I fired a second round… was about to lose visual on him. And since he wasn't down, he still a threat to the officers above, as well as the officers down below if he gets into that shrubbery, I fired a third round.  Defendant Officer Martin fired a total of three rounds with his rifle on to an unarmed Soderberg from a distance of approximately 600 feet.

68.    Defendant DOE Officer 2 reported that he heard gunfire upon Soderberg and then saw him slide over the edge of the retaining wall and fall into the ravine. Defendant DOE Officer 2 reported that "It looks like he's scrambling with his head towards one of the teams, and it looks, from out distance, that he's making like looking towards them." Although DOE Officer 2 was approximately 600 feet away from Soderberg, and Soderberg hadn't been armed for over an hour and thirty minutes, he reported that "[b]ut you can't, I can't really see his hands… So as [Soderberg] jumps down [the ravine], I see that I still can't see his hand. It looks like he's sliding down the hill and his right hand behind him. I made a determination that he's either going to hurt other officers or escape into that brush area I told you about. Either and like I said, injuring other off -- officers or if he got into that brush area then he would be injuring us. I believe he was still armed. So I fire two rounds, center mass… And I don't know if it was his head or his tan pants or his arm or what, but I couldn't figure it -- I couldn't see it from that distance." When asked why DOE Officer 2 believed Soderberg was still armed when he couldn't see his hand, DOE Officer 2 reported "I don't know. Just -- just his actions of what -- how he jumped out of that landing, or that wall after the exchange of gunfire." Defendant DOE Officer 2 fired a total of three rounds with his rifle on to an unarmed Soderberg from a distance of approximately 600 feet.

69.    Defendant Officer Jerry Fritz reported that he heard gunfire upon Soderberg and then saw him slide over the edge of the retaining wall and fall into the ravine.  Although Defendant Officer Fritz was approximately 600 feet away from Soderberg, and Soderberg hadn't been armed for over an hour and thirty minutes, he

reported that "[Soderberg] had what appeared to me to be a dark object in his right hand as he landed on the hillside and began to slide down the hillside… At this point, I couldn't actually see the object anymore because his hand was close to his waistband, but I immediately realized that he was on the verge of escaping the containment into that danger zone that we refer to. He posed a significant threat to not only the public, but to us downrange, and the folks above him on the hill." Officer Fritz reported that "at the time I fired, it appeared to me that the [Soderberg] had gained a foothold, was able to, quote, unquote, 'stand upright.' I know it probably isn't accurate that he was completely standing upright due to the terrain, but he definitely was in control of his movements. He was looking not only downward, but at times would glance up and try to assess position of the officers above him, in my opinion. And he had his right hand down near his waistband holding -- I couldn't see at that point what the object was because the movement was so fast, but he appeared to be holding something by his right waistband. And at the time he had fallen off the wall, I saw what I believed to be a handgun in his right hand. I assumed that to be the same object he was still attempting to hold on his way down, making his way down the terrain." Officer Fritz also reported that "in order to stop that threat, I fired two rounds from my police rifle in an attempt to stop the [Soderberg's] actions.  Defendant Officer Jerry Fritz fired a total of two rounds with his rifle on to an unarmed Soderberg from a distance of approximately 600 feet.

### OIS: Officers Jeremy Escamilla, Canaan Bodell, and Billy Lee

70.    After taking on all the gunfire and coming to a stop on the side of the hill in the ravine, Defendant Officers Jeremy Escamilla, Canaan Bodell, and Billy Lee were positioned to the east of the residence with a vantage point over the ravine and approximately 165 - 200 feet away where Soderberg had stopped falling. **Despite being nearly 200 feet away and witnessing the severely injured Soderberg face down in the ravine, Officers Escamilla, Bodell, and Lee all reported that they believed Soderberg was trying to escape, was concealing a weapon, were in fear of their lives, and therefore fired at total of seven rounds upon the unarmed Soderberg.**

71.     Defendant Officer Jeremy Escamilla reported that he saw Soderberg face down and "couldn't see because of the vegetation anything in his - if he had anything in his left hand. And I couldn't see his right hand because it was tucked up underneath him… So, he -- what I -- what I observed was he started moving with what looked to me, his right shoulder dipping down towards the ground, and his left shoulder slightly dipping up, almost like he's -- I guess rolling. That rolling motion, I didn't see anything from his legs movement, I just saw that part from him, and a slight movement of the head at the same time when his body started rolling. That's what -- that's the movement I observed if that makes sense." Officer Escamilla reported that he had heard a broadcast that the arrest team was going to start walking toward the ravine. As a result, Officer Escamilla reported that, for no reason other than other Officers starting to walk toward the ravine, he feared for their lives and fired upon Soderberg.  Officer Escamilla reported to assessing Soderberg after the shot, but fired two more shots until seeing that Soderberg was no longer moving. Defendant Officer Jeremy Escamilla fired a total of three rounds with his rifle on to an unarmed Soderberg from a distance of approximately 175 feet.

72.     Defendant Officer Canaan Bodell reported that he heard gunfire and, "based on that, I formed the opinion that [Soderberg] still had a gun. I could not see it, but in my mind, he was still armed with his weapon." Upon approaching the flanking position over the ravine, Officer Bodell reported to that "it appeared that [Soderberg] just kind of rolled slightly towards his right shoulder, so almost like he was going to roll down the hill, roll slightly and at that point, I fired" upon Soderberg. Defendant Officer Bodell fired a total of one round with his rifle on to an unarmed Soderberg from a distance of approximately 175 feet.

73.     Defendant Officer Billy Lee reported that he heard gunfire and moved toward the flanking position overlooking Soderberg.  Officer Lee reported that "[w]hen I saw him on the as soon as I landed on the ridge, he was in a kneeling position again, and his left arm was extended out in a shooting position, and his right arm was

underneath his chest, but there was a gap of -- of brush or what I perceived to be the ground in which he could easily be manipulating a weapon from my vantage point. In addition to that, the team was exposed, and as soon as I got into what I believe was a kneeling position, I perceived a deadly threat…"  Officer Lee reported that "I did not see a weapon from my vantage point… And to me, that raised an - a possibility - well, not a possibility, but I - I knew in my mind, I perceived that as potentially being a handgun because I could not see skin.  It was just a black-type object in his left hand." Despite not seeing weapon, Officer Lee reported that " I felt like I was a critical moment where I had to take action to preserve the life of my partners or prevent from serious -- serious bodily injury from an individual who exhibited all signs of wanting to take this to -- to the end. And I focused my sights, and I deployed one round from my rifle, assessed he was still in that shooting position. I fired again believing that he was going to fire a second time, assessing between each position, each shot and deployed another round the third time. And at this time, after that last assessment, myself, I believe that the team knew where he was at, and now they were set up behind cover, and that was the end of my three shots that I fired in defense of my teammates' lives." Defendant Officer Lee fired a total of three rounds with his rifle on to an unarmed Soderberg from a distance of approximately 175 feet.

**Defendant Officers Cliff Chu and DOE Officer 3**

74.    Once the shooting stopped, the officers approached Soderberg's body. Unsure if he was still alive, Officer Chu was ordered to shoot Soderberg with a less-lethal weapon just to see if he would move. He did not. Chu shot Soderberg 4 times at a time when he was a threat to no one likely barely alive.  Thereafter, DOE Officer, identified as Officer OO in the BOPC report, deployed his police canine, which attacked Soderberg's hand and bit into it. Only then did they move forward, and quickly determine that Soderberg was dead.

**INCIDENT AFTERMATH**

75.    The Medical Examiner determined that Soderberg had been shot 17 times and had a total of 31 entry and exit wounds, all from high-powered rifles. This included 5 shots to the back, all identified by the Medical Examiner as fatal. All 17 shots occurred at a time when Soderberg was unarmed, since only Officer O fired the first time Soderberg exited the house—the only time Soderberg had the gun in his hand—and he missed with all 6 shots. Additionally, Soderberg had been exposed to CS with the introduction of at least 30 Ferret rounds, and twice to the devastating effects of hot gas. He had multiple sting grenades explode within inches from his body, and even in death he had been shot 4 times with less lethal projectiles and bitten by a police canine.

76.    In light of foregoing, the Defendant officers' use of intermediate and deadly force was not objectively reasonable. The Defendant officers used excessive force against the Soderberg when they shot him, deployed hot gas, used sting grenades in close proximity to his body, shot him with less lethal weaponry, and ordered a police canine to attack him. The defendant officers' unjustified and excessive use of force deprived Soderberg of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Soderberg under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

**VIOLATION OF CIVIL RIGHTS**

77.    Plaintiffs repeat and re-allege each and every allegation in preceding paragraphs of this Complaint as if fully set forth herein.

78.    Based on the facts readily available and known to the Defendant Officers, no reasonable conclusion could be drawn that the force used by Defendant Officers was reasonable, as Soderberg posed no immediate threat of death or seriously bodily injury at the time of each Defendant Officer's decision to shoot.  All objective facts readily available and known to the Defendant Officers could have reasonably led the Officers to conclude that Soderberg was not a threat requiring the use deadly force. As a result of the foregoing, Soderberg suffered great physical pain and emotional distress up to

the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity. Further, the Defendant Officers actions and use of force, including the multiple shots with deadly force, violated their training and accepted standards of police practice.

79.     The Defendant Officers, under color of law, intentionally, recklessly, negligently, unlawfully, with malice, fraud, and oppression, violated Soderberg's Civil Rights and his right to be secure in his person against unreasonable searches and seizures and without the use of excessive force as guaranteed to the Soderberg under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

80.     Plaintiffs further allege that the Defendant, with deliberate indifference to and reckless disregard for the safety and well-being of Soderberg, and in violation of the Fourth and Fourteenth Amendments to the Constitution, committed or allow to be committed, acts which deprived Soderberg of his Constitutional rights without affording him due process of law.

81.     Moreover, as discussed in detail herein, the Defendant Officers, and DOES 1 through 50, directly participated and/or aided and abetted in the wrongful shooting of the Plaintiff and engaged in efforts to cover up said conduct by preparing or authorizing or approving false police reports, and/or aiding and abetting the preparation, authorization, or approval of false police reports to cover up said wrongful arrest and violation of Plaintiff's rights.

82.     The shooting and use of force violated Defendants' training. Accordingly, Defendant Officers are liable to Plaintiff for compensatory and punitive damages, including both survival damages and wrongful death damages, under 42 U.S.C. § 1983.

83.     Upon information and belief, after being shot,  Soderberg was immobile, bleeding profusely, and in obvious and critical need of emergency medical care and treatment. Despite  Soderberg's physical state, Defendants did not timely summon medical care or permit medical personnel to treat  Soderberg. The delay of medical care to  Soderberg caused  Soderberg extreme physical and emotional pain and suffering and

was a contributing cause of Soderberg's death.

84.     Plaintiff SHIRLEY was dependent on Soderberg, to some extent, for the necessities of life.

85.     SHIRLEY is Soderberg's successors-in-interest and succeeds to Soderberg's interest in this action as the natural mother of Soderberg.

86.     The shooting of Soderberg was a result of the unconstitutional policies, practices and procedures in place at the City of Los Angeles Police Department regarding the use of firearms and other restraining devices against unarmed suspects. Said policies, practices and procedures were sanctioned, authorized and ratified by the Defendants CITY, LAPD, and DOES 31 through 50 and by supervising and administrative personnel, including but not limited to Sergeants, Lieutenants, Captains, Commanders, and other supervising staff. The LAPD, Chief Beck, and DOES 31 through 50 ratify and condone the intentional and/or negligent use of force by LAPD officers. The City of Los Angeles and the Los Angeles Police Department ratifies, condones, and acquiesces in the filing of false police reports to "cover up" negligent and/or excessive use of force. The CITY and the LAPD ratifies, condones, and acquiesces, in the falsification of evidence, the "planting" of evidence to "cover up" the negligent and/or excessive use of force, false arrests, and other police misconduct. As a direct result of the death of Soderberg, Plaintiffs have suffered the loss of earnings and services of economic value, and the loss of love, support and services of Soderberg. Further, as a direct result of the intentional and/or negligent use of force which was used against Soderberg, the present Plaintiffs' Fourteenth Amendment substantive due process rights to be free from unwarranted state interference in Plaintiffs' familial relationship with Soderberg has been violated; and Defendants have intentionally interfered with the parent-child relationship between SHIRLY and the Soderberg which was caused by the acts and omissions of all of the Defendants in causing the death of her son, Anthony Soderberg.

87.     Plaintiff, SHIRLEY, as personal representative of the ESTATE ANTHONY SODERBERG claims damages for the conscious pain and suffering incurred by SODERBERG, as provided for under 42 U.S.C. §1983.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**EXCESSIVE FORCE**

***(Plaintiffs against Defendant Officers and DOES 1 through 50)***

88.     Plaintiffs reallege and incorporate by reference the paragraphs and allegations contained in all the preceding paragraphs of this complaint, as though fully set forth herein.

89.     Defendant Officers Michael Messenger, Robert Gallegos, David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee, DOE Officer 1, DOE Officer 2, and DOE Officer 3 (Collectively "Defendant Officers") used excessive force against SODERBERG when they shot him. Defendant Officers' unjustified excessive use of force deprived  Soderberg of his right to be secure in his person against unreasonable searches and seizures as guaranteed to  Soderberg under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

90.     Based on the facts readily available and known to Defendant Officers, no reasonable conclusion could be drawn that force used was reasonable, as  Soderberg posed no immediate threat of death or seriously bodily injury at the time of the shooting. All objective facts readily available and known to Defendant Officers could have reasonably led the officers to conclude that Plaintiff was a threat requiring the use deadly force. As a result of the foregoing,  Soderberg suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity. Further, Defendant Officers' actions and use of force, including shooting at  Soderberg, violated their training and standard police officer training.

91.     Defendant Officers, under color of law intentionally, recklessly, negligently, unlawfully, with malice, fraud, and oppression violated Plaintiff's Civil Rights and his right to be secure in his person against unreasonable searches and seizures as guaranteed to Soderberg under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

92.     Plaintiff further alleges that Defendants, with deliberate indifference to and reckless disregard for the safety and well-being of Plaintiff, and in violation of the Fourth and Fourteenth Amendments to the Constitution, committed or allow to be committed, acts which deprived Plaintiff of his Constitutional rights without affording him due process of law.

93.     Defendant Officers and DOES 1 through 50 directly participated and/or aided and abetted in wrongful shooting of Plaintiff and engaged in efforts to cover up said conduct by preparing or authorizing or approving false police reports, and/or aiding and abetting the preparation, authorization or approval of false police reports to cover up said wrongful arrest and violation of Plaintiff's rights.

94.     SHIRLEY brings this claim as successors-in-interest to the Soderberg and seek both survival and wrongful death damages for the violation of Soderberg's rights. Due to the conduct of Defendants, Plaintiff has suffered general damages and special damages, all in a sum to be proved at trial. Due to the conduct of Defendants, Plaintiff has been required to incur attorneys' fees and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proved at trial and recoverable pursuant to 42 U.S.C. §1988.

95.     Defendant Officers and DOES 1 through 50 acted with a conscious disregard of Plaintiff's rights conferred upon them by Section 1983, Title 42 of the United States Code, the Fourth Amendment to the United States Constitution and California Civil Code Section 3333, by intentionally and unnecessarily causing him great bodily injury and death.

96.    Said conduct of Defendants constitutes malice, oppression and/or fraud under California Civil Code § 3294, entitling Plaintiff to punitive damages against the individual Defendants in an amount suitable to punish and set an example of said Defendants.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### WRONGFUL DEATH

### (*Plaintiffs against Defendant Officers and DOES 1 through 50*)

97.    Plaintiffs reallege and incorporate by reference the paragraphs and allegations contained in all the preceding paragraphs of this complaint, as though fully set forth herein.

98.    Defendant Defendant Officers Michael Messenger, Robert Gallegos, David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee, DOE Officer 1, DOE Officer 2, and DOE Officer 3 (Collectively "Defendant Officers")used excessive force against  Soderberg when they shot him. Defendant Officers' unjustified excessive use of force deprived SODERBERG of his right to be secure in his person against unreasonable searches and seizures as guaranteed to  Soderberg under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

99.    Based on the facts readily available and known to Defendant Officers, no reasonable conclusion could be drawn that force used was reasonable, as  Soderberg posed no immediate threat of death or seriously bodily injury at the time of the shooting. All objective facts readily available and known to Defendant Officers could have reasonably led the officers to conclude that Plaintiff was a threat requiring the use deadly force. As a result of the foregoing,  Soderberg suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity. Further, Defendant Officers' actions and use of force, including

shooting at Soderberg, violated their training and standard police officer training.

100.   Defendant Officers, under color of law intentionally, recklessly, negligently, unlawfully, with malice, fraud, and oppression violated Plaintiff's Civil Rights and his right to be secure in his person against unreasonable searches and seizures as guaranteed to Soderberg under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

101.   Plaintiff further alleges that Defendants, with deliberate indifference to and reckless disregard for the safety and well-being of Plaintiff, and in violation of the Fourth and Fourteenth Amendments to the Constitution, committed or allow to be committed, acts which deprived Plaintiff of his Constitutional rights without affording him due process of law.

102.   Defendant Officers and DOES 1 through 50 directly participated and/or aided and abetted in wrongful shooting of Plaintiff and engaged in efforts to cover up said conduct by preparing or authorizing or approving false police reports, and/or aiding and abetting the preparation, authorization or approval of false police reports to cover up said wrongful arrest and violation of Plaintiff's rights.

103.   SHIRLEY brings this claim as successors-in-interest to the Soderberg, and seek both survival and wrongful death damages for the violation of Soderberg's rights. Due to the conduct of Defendants, Plaintiff has suffered general damages and special damages, all in a sum to be proved at trial. Due to the conduct of Defendants, Plaintiff has been required to incur attorneys' fees and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proved at trial and recoverable pursuant to 42 U.S.C.§1988.

104.   Defendant Officers and DOES 1 through 50 acted with a conscious disregard of Plaintiff's rights conferred upon them by Section 1983, Title 42 of the United States Code, the Fourth Amendment to the United States Constitution and California Civil Code Section 3333, by intentionally and unnecessarily causing him great bodily injury and death.

105.   Said conduct of Defendants constitutes malice, oppression and/or fraud under California Civil Code § 3294, entitling Plaintiff to punitive damages against the individual Defendants in an amount suitable to punish and set an example of said Defendants.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### SUBSTANTIVE DUE PROCESS

#### (*Plaintiffs against Defendant Officers and DOES 1 through 50*)

106.   Plaintiffs reallege and incorporate by reference the paragraphs and allegations contained in all the preceding paragraphs of this complaint, as though fully set forth herein.

107.   Plaintiff SHIRLEY had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with her son, Soderberg.

108.   Soderberg had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in a manner to shock the conscience.

109.   The aforementioned actions of Defendant Officers, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Soderberg and Plaintiff, and with purpose to harm unrelated to any legitimate law enforcement objective.

110.   As a direct and proximate result of these actions, Soderberg experienced pain and suffering and eventually died. Defendant Officers thus violated the substantive due process rights of Plaintiff to be free from unwarranted interference with their familial relationship with Soderberg.

111.   As a direct and proximate cause of the acts of Defendant Officers, Plaintiff and  Soderberg suffered emotional distress, mental anguish, and pain. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of  Soderberg, and will continue to be so deprived for the remainder of their natural life.

112.   The conduct of Defendant Officers was willful, wanton, malicious, and done with reckless disregard for the rights and safety of  Soderberg and Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to Defendant Officers.

113.   SHIRLEY bring this claim individually and as a successors-in-interest to the Soderberg and seek both survival and wrongful damages. Plaintiffs also seek attorneys' fees under this claim.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### *DEVEREAUX* CLAIM

**(*Plaintiffs against Defendant Officers and DOES 1 through 50*)**

114.   Plaintiffs reallege and incorporate by reference the paragraphs and allegations contained in all the preceding paragraphs of this complaint, as though fully set forth herein.

115.   At all times material to this Complaint, Defendant Officers Michael Messenger, Robert Gallegos, David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee, DOE Officer 1, DOE Officer 2, and DOE Officer 3 (Collectively "Defendant Officers") and DOES 1 through 50  (collectively "Defendants"), were acting under color of the law in violating Plaintiff's constitutional rights as herein under the First, Fourth and Fourteenth Amendments to the Constitution of the United States. The First, Fourth and Fourteenth Amendments are made applicable to the States pursuant to 42 U.S.C §1983.

116.   Defendants deprived Plaintiff of rights, privileges, and immunities secured to him by the First, Fourth and Fourteenth Amendments to the United States Constitution by, *inter alia*, subjecting Soderberg to an unlawful search and seizure, arresting and/or causing Plaintiff to be arrested without probable cause, conspiring to deprive Plaintiff of his constitutionally protected rights, submitting reports with material omissions, providing falsehoods to secure an arrest and prosecution of Plaintiff.

117.   Defendants directly participated and/or aided and abetted in the wrongful arrest and shooting of Soderberg and engaged in efforts to cover up said wrongful conduct by providing false testimony, preparing or authorizing or approving false police reports, and/or aiding and abetting the preparation, authorization, or approval of false police reports to maliciously prosecute Plaintiff.

118.   Due to the conduct of Defendants, and each of them, Plaintiffs have suffered general damages and special damages, all in sum to be proved at trial. Due to the conduct of Defendants, and each of them, Plaintiffs have been required to incur attorneys' fees and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proved at trial and recoverable pursuant to 42 U.S.C. §1988.

119.   Defendants acted with a conscious disregard of Plaintiff's rights conferred upon him by Section 1983, Title 42 of the United States Code, the Fourth Amendment to the United States Constitution and California Civil Code Section 3333, by intentionally causing him injury and arresting him without probable cause. Defendants, and each of them, had an interest in seeing Soderberg charged with criminal conduct to detract from Defendants unlawful conduct and shooting of Soderberg and use of excessive force.

120.   Said conduct of Defendants constitutes malice, oppression and/or fraud, entitling Plaintiff to punitive damages against individual Defendants in an amount suitable to punish and set an example of said Defendants.

### FIFTH CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### *MONNEL* CLAIM

### (Plaintiffs against all Defendants)

121.   Plaintiffs reallege and incorporate by reference the paragraphs and allegations contained in all the preceding paragraphs of this complaint, as though fully set forth herein.

122.   At all relevant times, Defendant Officers Michael Messenger, Robert Gallegos, David Keortge, Mario Rios, Juan Flores, Cliff Chu, Jerry Fritz, Gregory Martin, Canaan Bodell, Jonathon Pultz, Joseph Goosby, Jeremy Escamilla, Billy Lee, DOE Officer 1, DOE Officer 2, and DOE Officer 3 (Collectively "Defendant Officers") and DOES 1 through 50  (collectively "Defendants")acted under color of law. The acts of Defendants deprived SODERBERG and Plaintiffs of their particular rights under the United States Constitution.

123.   Upon information and belief, the LAPD, Chief Beck, and DOES 31 - 50 were final policymaker, acting under color of law, who had final policymaking authority concerning the acts of Defendants, ratified Defendants acts and the bases for them. Upon information and belief, the final policymaker knew of and specifically approved of Defendants acts.

124.   Upon information and belief, the LAPD, Chief Beck, and DOES 31 - 50 as final policymakers has determined that the acts of Defendants were "within policy."

125.   By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of  Soderberg. The aforementioned acts and omissions also caused  Soderberg's pain and suffering, loss of enjoyment of life, and death.

126.   Accordingly, Defendants the LAPD, Chief Beck, and DOES 31 - 50each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

127.  Plaintiff SHIRLEY bring this claim as a successors-in-interest to Soderberg and seek both survival and wrongful death damages under this claim. Plaintiffs also seek attorney's fees under this claim.

128.  The training policies of Defendant the LAPD and DOES 31 – 50 were not adequate to train its officers to handle the usual and recurring situations with which they must deal.

129.  Defendant the LAPD and DOES 31 - 50 were deliberately indifferent to the obvious consequences of its failure to train Defendants its officers adequately.

130.  The failure of Defendant the LAPD and DOES 31 - 50 to provide adequate training caused the deprivation of Plaintiffs' rights; that is, Defendants' failure to train is so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury.

131.  On information and belief, the LAPD and DOES 31 - 50 failed to train Defendants properly and adequately.

132.  By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of  Soderberg. The aforementioned acts and omissions also caused  Soderberg's pain and suffering, loss of enjoyment of life, and death.

133.  Accordingly, Defendants the LAPD, and DOES 31 - 50are each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

134.  Plaintiffs bring this claim as a successors-in-interest to Soderberg and seek both survival and wrongful death damages under this claim. Plaintiffs also seek attorney fees under this claim.

135.  Defendant Officers and DOES 1 through 50 acted pursuant to an expressly adopted official policy or a longstanding practice or custom of the Defendant the LAPD, Chief Beck, and DOES 31 - 50.

136.   On information and belief, Defendant Officers and DOES 1 through 50 were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Soderberg's death.

137.   Defendants the LAPD, and DOES 31 - 50together with other CITY policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a) Using excessive force, including excessive deadly force;

(b) Providing inadequate training regarding the use of deadly force;

(c) Employing and retaining as police officers individuals such as Defendant Officers DOES 1 through 50, who Defendant CITY at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force;

(d) Inadequately supervising, training, controlling, assigning, and disciplining CITY officers, and other personnel, including Defendant Officers and DOES 1 through 50, who Defendant CITY knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(e) Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by CITY officers, Defendant Officers, and DOES 1 through 50;

(f) Failing to adequately discipline CITY police officers, including Defendant Officers and DOES 1 through 50, for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(g) Announcing that unjustified shootings are "within policy," including shootings that were later determined in court to be unconstitutional;

(h) Even where shootings are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the officers involved;

(i) Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police shootings, including by failing to discipline, retrain, investigate, terminate, and recommend officers for criminal prosecution who participate in unjustified shootings.

138.   By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of  Soderberg. The aforementioned acts and omissions also caused  Soderberg's pain and suffering, loss of enjoyment of life, and death.

139.   Defendants the LAPD, and DOES 31 - 50, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of  Soderberg, Plaintiff, and other individuals similarly situated.

140.   By perpetrating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, DOES 1 through 50 acted with intentional, reckless, and callous disregard for the life of  Soderberg and for  Soderberg's and Plaintiff's constitutional rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants CITY and DOES 1 through 50 were affirmatively linked to and were a significantly influential force behind the injuries of Soderberg and Plaintiff.

141.   Accordingly, Defendants CITY and DOES 1 through 50 each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

142.   Plaintiffs bring this claim individually and as a successors-in-interest to Soderberg and seek both survival and wrongful death damages under this claim. Plaintiff also seeks attorneys' fees under this claim.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs prays for judgment as follows:

1.   For general damages in an amount to be determined by proof at trial;

2.   For special damages in an amount to be determined by proof at trial;

3.   For punitive and exemplary damages against all Defendants and DOES 1 through 50;

4.   For costs of suit;

5.   For reasonable attorneys' fees and costs as provided by statute; and

6.   For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a jury trial.

DATED:  August 20, 2018                          **KIRAKOSIAN LAW, APC**


                                        By:   /s/ *GREG L. KIRAKOSIAN*          .
                                              GREG L. KIRAKOSIAN
                                              Attorneys for Plaintiffs