# EXHIBIT 27

# DEFENDANTS' CITATIONS

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

```
1                UNITED STATES DISTRICT COURT

2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ESTATE OF ANTHONY SODERBERG, et al., )
                                          )
5              Plaintiffs,                )
                                          )
6              vs.                        )   Case No.
                                          )   2:18-CV-3861-FMO-JPR
7    LOS ANGELES POLICE DEPARTMENT, et al.,)
                                          )
8              Defendants.                )
     _____)       ORIGINAL
9

10

11

12

13

14           DEPOSITION OF OFFICER MARIO RIOS

15                LOS ANGELES, CALIFORNIA

16               TUESDAY, AUGUST 13, 2019

17

18

19

20

21

22

23

24   Reported by:  Jinna Grace Kim, CSR No. 14151

25   Job No.:  255908
```

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1       A.   Notification, yes.

2       Q.   Was the notification in writing, or did somebody

3   call you?

4       A.   It was an e-mail.

5       Q.   Do you remember the content of the e-mail?

6       A.   It was a SWAT call-up:  Barricaded suspect regarding

7   a burglary; victim evacuated from the house; stated that

8   there was numerous guns and ammo inside; and the suspect was

9   refusing to come out.

10      Q.   And you heard that before you got on the scene?

11      A.   Yes.

12      Q.   Were you on-duty at the time you got that call?

13      A.   I don't remember if I was on-duty or off.

14           Once I was got the call, I was considered on-duty.

15      Q.   Was the e-mail asking for more officers or SWAT

16  officers to respond, available officers?

17           MR. BRENTE:  Object.  Vague and ambiguous, "more."

18  BY MR. KIRAKOSIAN:

19      Q.   Was it looking for officers to respond?

20           MR. GILBERT:  Speculation.

21           MR. BRENTE:  Also vague, "looking for."

22           You can answer.

23           THE WITNESS:  I don't remember.  It was a

24  possibility because there was a lot of terrain there.

25  BY MR. KIRAKOSIAN:

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
1            THE WITNESS:  I was just --

2   BY MR. KIRAKOSIAN:

3        Q.   Do you understand what I'm saying?

4        A.   I was just watching the screen.

5        Q.   And what do you recall seeing on the screen?

6        A.   The first time I saw the suspect is when he came out

7   of the kitchen door.  He had a gun in his right hand, a black

8   gun.  He seemed very agitated.

9        Q.   What do you mean by "agitated?"

10        A.   He just didn't have a calm demeanor.  He looked kind

11   of wired.  He looked agitated, kind of jumping up and down,

12   really moving around, like -- in my opinion, someone that

13   would be, like, on methamphetamine.

14            He was looking around, and then he started making

15   his way down Side 1 --

16        Q.   Toward Side 1?

17        A.   Toward Side 1.

18        Q.   Go ahead.

19        A.   At that time raising the black gun and walking

20   toward Side 1.

21        Q.   Did he ever walk out into the court yard?

22        A.   No.

23        Q.   He seemed agitated, jumpy.

24            And he walked how toward the Side 1?

25        A.   He walked --
```

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1      Q.   His positioning.

2      A.   His position -- his right arm was extended in front

3   of him, hugging the wall, basically walking towards Side 1.

4      Q.   What part of his body was hugging the wall, if you

5   remember?

6      A.   His shoulder.  You know, and then at that time --

7      Q.   His left shoulder?

8      A.   It would be, like, his left shoulder, his chest

9   area, and then at a certain point in time, I lost visual from

10  the robot.

11     Q.   What happened next?

12          If you can't see him, did you hear anything or --

13     A.   The officers were putting out, "Suspect is outside.

14  He has a gun.  He's walking towards Side 1."

15          After I lost visual of him, I heard gunshots.

16  Shortly after that I can see the suspect come back in the

17  view of the robot and appeared that he was basically

18  covering, kind of jumping and covering from what appeared to

19  be rounds coming his way.

20          Then he ran back into the doorway.

21     Q.   The kitchen doorway?

22     A.   Yes, sir.

23     Q.   You couldn't see Mr. Soderberg firing from the

24  monitor?

25     A.   I did not.  I did not see that.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1     Q.    Did Officer Chinappi and Corbet -- is that who was

2   on the monitor --

3     A.    Yes.

4     Q.    Is that who announced he was coming out with a

5   gun?

6     A.    Yes.

7     Q.    So were they able to watch him on the monitor --

8           MR. GILBERT:  Speculation.

9           MR. BRENTE:  Yes.  Calls for speculation.

10          THE WITNESS:  I don't know if they saw more than I

11  did, but I lost sight of him.

12  BY MR. KIRAKOSIAN:

13    Q.    After you lost sight of him, somebody called out,

14  like you said, that he was coming out with a gun?

15          Do you know who made that call?

16    A.    I do not.

17    Q.    Was it Officers Chinappi and Corbet?

18    A.    It was probably one of them.

19    Q.    Could they see him another way outside of the

20  monitor?

21    A.    No.

22    Q.    Could you see him in any other way outside of the

23  monitor?

24    A.    No.

25    Q.    You heard a gunshot next; is that correct?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1   the kitchen; is that correct?

2      A.   He went back to the doorway of the kitchen.

3      Q.   Okay.  He didn't go inside?

4      A.   No.

5      Q.   Was he in your view on the monitor?

6      A.   Yes.

7      Q.   What was he doing when he was in the doorway?

8      A.   At that time he crouched down in a kneeling

9   position.  He raised a black pistol up in the air with both

10  hands as he was aiming in the air, and he fired several

11  rounds at the air, which I believe he was shooting at the

12  airship because I could hear the airship overhead.

13     Q.   It was directly overhead?

14          Was it over Big Canyon Road?  Do you remember where

15  it was at this time --

16          MR. BRENTE:  I'm going to object as vague and

17  ambiguous.  Calls for speculation.

18          MR. GILBERT:  Foundation that he can see the

19  airship.

20          THE WITNESS:  I cannot see the airship.  I just knew

21  it was overhead because I can hear it.

22  BY MR. KIRAKOSIAN:

23     Q.   You knew it was airborne or overhead?

24          I'm getting confused by "overhead."  Overhead

25  implies it was --

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1   before.

2       A.   So Officer Killman was on the left side of the

3   doorway and Officer Pultz was on the right side of the

4   doorway.

5           Officer Killman needed to put on his gas mask.  So

6   he relieved his position to put on his gas mask.  Officer

7   Pultz took his position to the left, and I took Officer

8   Pultz's position to the right of the doorway.

9       Q.   From your position now at the doorway, could you see

10  the kitchen door?

11      A.   No.

12      Q.   So did somebody call out that he was coming out of

13  the doorway, out of the kitchen door?

14      A.   Yes.

15      Q.   Do you know who that was?

16      A.   I believe it was Officer Corbet.

17      Q.   Do you remember what he stated with respect to

18  Mr. Soderberg coming out of the kitchen door?

19      A.   He said something to the fact of, "Suspect is coming

20  out.  He's holding his waistband, and he has something in his

21  hand."

22      Q.   Did he say which hand?

23      A.   I don't remember.

24      Q.   Which hand -- either had something in his hand or

25  was holding his waistband.

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1          Did he identify which hand?

2     A.   I don't remember.

3     Q.   And then at what point does he come into your visual

4     after the officer stated that he was holding his waistband?

5     A.   Shortly after he stated that, I observed the suspect

6     run in north direction to an eastbound direction through the

7     court yard.

8     Q.   So running toward the 3 Side from along 2, toward

9     3?

10    A.   Yes.  But he wasn't -- he did not run alongside the

11    wall.  He ran out into the door, into the court yard where

12    we had visual of him, and then he turned, basically, to run

13    eastbound towards the 3 Side.

14    Q.   From your position in that doorway, could you see

15    the 3 Side?

16    A.   We can just see pretty much the court yard that's

17    going towards the 3 Side.  We cannot see, like, 3 Side or the

18    back of the house or anything like that.

19    Q.   There were officers positioned on the 3 Side; is

20    that correct, as far as you know --

21         MR. BRENTE:  I'm going to object as calling for

22    speculation and vague as to time.

23         THE WITNESS:  Yes.  There's going to be officers on

24    the 3 Side containment.

25    BY MR. KIRAKOSIAN:

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1            (Simultaneously speaking.)

 2            MR. BRENTE:  -- see the helicopter orbit of the Side

 3    4?

 4            MR. KIRAKOSIAN:  Correct.

 5            MR. GILBERT:  Vague.  Assumes fact there is one

 6    helicopter.

 7            Go ahead.

 8            THE WITNESS:  Once I was in -- when I was inside the

 9    garage, I did not see any helicopter.

10    BY MR. KIRAKOSIAN:

11        Q.  You couldn't see the helicopters once you were in

12    the detached garage?

13        A.  I could not.

14        Q.  Now, we're back in time where you see a visual of

15    Mr. Soderberg while you were in the doorway.

16            Can you walk me through what you see.

17            MR. GILBERT:  Vague.  Overbroad.  Asked and

18    answered.

19            MR. BRENTE:  Join.

20            THE WITNESS:  While I'm in the doorway of the

21    detached garage, I see the suspect running in a northbound

22    direction into the courtyard to eastbound direction, towards

23    Side 3.

24            At that time the suspect turns, looks over his right

25    shoulder, and extends his right arm and points it in my
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    direction.

2    BY MR. KIRAKOSIAN:

3        Q.    So he's running toward along Side 2, or I guess on

4    the court yard, which is on Side 2?

5        A.    Correct.

6        Q.    And he's running toward Side 3?

7        A.    Correct.

8        Q.    Which is the north side?

9        A.    It would be the east side.

10        Q.    Northeast, east side?

11        A.    If he looks out, the kitchen door is north and Side

12    3 would be east.

13        Q.    So he's running east; is that correct?

14        A.    Yes.

15        Q.    And what can you see before he turns?

16            What can you see with respect to his arm --

17            MR. BRENTE:    Okay.    Objection.    Vague as to time,

18    "before he turns."

19            Which turn are you talking about?

20            MR. KIRAKOSIAN:    The one he just referenced.

21            MR. BRENTE:    Well, he said he went north and turned

22    east.

23            Is that what turn you're asking about?    When he

24    turned in an easterly direction?

25    BY MR. KIRAKOSIAN:

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1      Q.   Did you see him come out and turn east, or did you
 2   see him just come out and start running east?
 3      A.   He came out running in a northbound direction and
 4   then veered to the east.
 5      Q.   Okay.  What could you see when he ran out before he
 6   turned east?
 7           MR. GILBERT:  Asked and answered.  Vague.
 8   Overbroad.
 9           THE WITNESS:  I saw --
10   BY MR. KIRAKOSIAN:
11      Q.   Which part of his body could you see?
12      A.   The left side of his body.
13      Q.   Did you see anything in his hand?
14      A.   At that time, no.
15      Q.   And then he starts turning eastward?
16      A.   He starts running eastward.  At the same time
17   turning over his right shoulder, extending his right arm in
18   my direction, appearing to be holding a weapon in his right
19   hand.
20      Q.   Did you see him turn over his right shoulder as he
21   was starting to turn east and run eastward?
22           MR. BRENTE:  Objection.  Vague.  Ambiguous.
23           THE WITNESS:  As he was running eastward toward Side
24   3 is when he turned over his right shoulder, looked back in
25   my direction, extended his right hand, his right arm.
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    Q.    You were west of him?

2    A.    Yes.

3    Q.    So was he essentially running east while looking

4    completely back at you?

5    A.    Correct --

6         MR. GILBERT:  Vague as to "looking completely back."

7    BY MR. KIRAKOSIAN:

8    Q.    He was -- had turned his entire upper body in the

9    opposite direction of where he was running; is that

10   correct?

11        MR. GILBERT:  Vague as to "turn his body in the

12   entire opposite direction."

13        THE WITNESS:  He had turned his head, looking in our

14   direction with his right arm extended in my direction.

15   BY MR. KIRAKOSIAN:

16   Q.    Which was the opposite direction of where he was

17   running; is that correct?

18   A.    Correct.

19   Q.    And what happens once you see that?

20        MR. BRENTE:  What's "that?"

21        MR. GILBERT:  Do you understand the question?

22        THE WITNESS:  Yes.  Once I see the suspect running,

23   turning his head, extending his arm out, it appeared that he

24   had a weapon in his right hand.

25   BY MR. KIRAKOSIAN:

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    Q.   Can you describe the dark object?

2    A.   It was just a dark, black object in his right

3    hand.

4    Q.   Was it like a phone?  Was it like a ball?

5         Could you tell me what shape the object was?

6    A.   It wasn't -- it didn't look small like a phone.

7         It didn't look round like a ball.  It just looked

8    like a black object that he was holding in his hand.

9    Q.   So you can't tell me anything more with respect to

10   the shape of the object?

11   A.   No.

12   Q.   What happens once you see that dark object in his

13   right hand?

14        MR. BRENTE:  Okay.  So that's just out of context.

15        He testified to a sequence of events that occurred

16   before at the same time he saw the dark object.

17   BY MR. KIRAKOSIAN:

18   Q.   You can clarify what happened next.

19        MR. GILBERT:  Vague.

20        THE WITNESS:  Well, based on everything that had

21   happened, the gunshots from inside the house, his statements,

22   I observed him with a gun in his hand --

23   BY MR. KIRAKOSIAN:

24   Q.   Was it a gun, or was it a dark object?

25   A.   When I observed him with a gun earlier, outside the

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1   doorway, him pointing the gun on Side 1, coming back to the

2   doorway, raising the gun up in the air and shooting at the

3   helicopter, with all those -- with all those facts and him

4   running out, him turning my direction, extending his arm out,

5   pointing the dark object which I believed was a gun, I fired

6   two rounds at the suspect.

7        Q.   Any other reasons why you fired?

8        A.   At that time when he was pointing that object in my

9   direction, I was -- I believed that he was about to engage

10  myself and my partner and the officers on Side 1 and inside

11  the garage.

12            So fearing that he was about to do that, I engaged

13  the suspect.

14       Q.   At that time were you behind any sort of cover?

15            MR. GILBERT:  Vague.

16            THE WITNESS:  I was -- I wouldn't say I was behind a

17  cover.  I was just in the doorway of the garage -- of the

18  detached garage.

19  BY MR. KIRAKOSIAN:

20       Q.   Was there anything in between you and Mr. Soderberg

21  at this time?

22            MR. BRENTE:  Objection.  Vague and ambiguous,

23  "anything between."

24            THE WITNESS:  There was nothing that was blocking my

25  view.  There was some patio furniture, but it was low.

```
 1              MR. GILBERT:  -- which piece of furniture are you
 2    referring to?
 3              THE WITNESS:  There was furniture outside in the
 4    patio.  He did not have to run or jump over the furniture,
 5    so.
 6              MR. GALIPO:  Maybe we'll go for a few more minutes
 7    and take a five-minute break?
 8              Would that work for everyone?  Give our court
 9    reporter a chance to take a breath?
10              MR. KIRAKOSIAN:  Yeah.  It's been an hour.
11              Do you want to take a break now?
12              MR. GALIPO:  Sure.  Let me take about a five-minute
13    break.
14              Does that work for everybody?
15              MR. BRENTE:  Yeah.
16              (Recess taken.)
17    BY MR. KIRAKOSIAN:
18        Q.    Sorry.  I'm going to go back to that time frame.
19              After observing what you had, you shot how many
20    times?
21        A.    Two times.
22        Q.    Do you know if you hit Mr. Soderberg?
23        A.    I believe I did, yes.
24        Q.    Where were you aiming?
25        A.    His right side.
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      A.   He was pretty much at the edge, the eastern edge of

2   the court yard, behind the patio furniture.

3      Q.   Was he taking cover behind the patio furniture, or

4   was he just behind the patio furniture?

5      A.   When he fell down, I sort of lost sight of him a

6   little bit because he was on the ground.  As I took one or

7   two steps forward to get better visual of the suspect, I

8   could see him crawling to the side of the house and put his

9   back against the house, basically, sitting on the ground with

10  his back against the house, and he was behind some

11  furniture.

12     Q.   How close to the add-on was he when he was sitting

13  with his back against the --

14     A.   The add-on which would be the little, kind of closet

15  area, the little --

16     Q.   Yeah.

17     A.   He was -- it was to his right.

18     Q.   How far to his right?

19     A.   Probably a foot or two.

20     Q.   Is there, like, an opening in that add-on?

21     A.   Yes.

22     Q.   So now you have a visual on Mr. Soderberg sitting

23  with his back against the wall very close to the add-on; is

24  that fair?

25     A.   That's correct.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      Q.   At this point were you able to get a visual on

2   Mr. Soderberg inside that shed?

3      A.   Yes.

4      Q.   How were you able to do that?

5      A.   Shortly after that one of the robots was positioned

6   into the shed, and they had a visual of him confirming that

7   he was inside the shed, and that he was laying on his stomach

8   with his arm under his chest.

9      Q.   Which arm under his chest?

10     A.   His right arm, I believe.

11     Q.   Anything else that was relayed regarding

12   Mr. Soderberg's position in the shed?

13     A.   Just that he was laying there.  They can see his

14   eyes opened, and it appeared that he was just laying

15   basically inside that shed area.

16     Q.   Anything about his injuries?

17          MR. BRENTE:  That was put out over the air?

18          MR. KIRAKOSIAN:  Correct.

19          THE WITNESS:  I don't remember about any particular

20   injuries at that time.

21   BY MR. KIRAKOSIAN:

22     Q.   Did anyone state what they believe Mr. Soderberg was

23   doing in the shed over the radio?

24     A.   The officers that were monitoring the robot in the

25   video on the robot stated that they can see his eyes

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1     opened.

2         Q.    Opened?  Or opening and closing?

3         A.    Opening and closing.  His arms were under his chest.

4     It appeared that he might be possibly playing possum or lying

5     in wait for someone to come into the shed.

6         Q.    When you say, "Playing possum" or "Lying in wait,"

7     you mean, he was not moving at all?

8         MR. BRENTE:  Well, he just relayed to you what he

9     heard over the radio.

10         So now you have a different question?

11    BY MR. KIRAKOSIAN:

12         Q.    Is that what "lying in wait" and "playing possum"

13    means?

14         Not moving?

15         MR. GILBERT:  Speculation.

16         THE WITNESS:  Well, that was just relayed from the

17    officers, and that's what they had stated that they believed

18    he was --

19    BY MR. KIRAKOSIAN:

20         Q.    Playing dead?

21         MR. BRENTE:  Okay.  So that misstates his

22    testimony.

23    BY MR. KIRAKOSIAN:

24         Q.    Is that what "playing possum" is?  Playing dead?

25         MR. GILBERT:  Speculation --

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

1      Q.    You were in the court yard when you deployed the

2   Stinger Grenade; is that correct?

3      A.    Yes.

4      Q.    And what happens next, as far as you know, once you

5   deploy the Stinger Grenade?

6      A.    After I deployed the Stinger Grenade we back up and

7   get cover.  The officer on the robot that's watching the

8   monitor stated that there was little effect to the suspect

9   and that he had looked back in the opening direction of the

10  shed to see if anybody was coming.

11          MR. BRENTE:  When you said, "He had looked back,"

12  who is the "he?"

13          THE WITNESS:  The suspect.

14  BY MR. KIRAKOSIAN:

15     Q.    Was he still on his stomach at this time?

16     A.    I cannot see him, but I believe the officer stated

17  that he's still on his stomach, and all he did was just look

18  back to see if anybody was coming in the shed.

19     Q.    So little movement from Mr. Soderberg, as far as you

20  know, after deployment of the Stinger Grenade?

21     A.    That's correct.

22     Q.    And what did they -- what's the plan after that?

23     A.    So the plan after that was to enter the residence.

24  The suspect was inside the shed, and there was a window right

25  above him.  So the plan was to enter the residence, break the

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1   window above where the suspect was laying, and at that time

2   deploy a Stinger Grenade and deploy a Tomahawk gas

3   canister.

4        Q.   Did you go into the house?

5        A.   Yes.

6        Q.   Which part of the house did you enter?

7        A.   We entered through the kitchen door that was in the

8   court yard.

9        Q.   When you say, "we," who are you referring to?

10       A.   Well, myself and other officers that responded

11  inside the house.

12       Q.   How many of you were there?

13       A.   Approximately five or six.

14       Q.   So you, five or six officers, you all enter the

15  kitchen?

16       A.   That's correct.

17       Q.   How long were you in the kitchen before you deployed

18  the Stinger Grenade and the Tomahawk?

19       A.   Probably a minute.

20       Q.   And I don't know how this works, but did one of you,

21  like, quickly run out and break the window, or run back in,

22  or break in, and deploy the Stinger Grenade and Tomahawk?

23            How does that work?

24       A.   So the plan was from inside the house that we would

25  smash the window, at the same time drop Stinger Grenade, and

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    deploy a Tomahawk through the window.

2        Q.    So is the -- you broke the kitchen window?

3            MR. BRENTE:    Okay.    So when you say, "you broke," I

4    don't know that he's testified that he broke anything.

5    BY MR. KIRAKOSIAN:

6        Q.    Was the kitchen window broken at this time?

7            MR. BRENTE:    Vague as to "this time."

8            THE WITNESS:    Once we initiated the plan, the

9    kitchen window was broken from inside the house.

10    BY MR. KIRAKOSIAN:

11        Q.    And from there the Stinger Grenade and Tomahawk

12    would be deployed?

13        A.    At the same time, correct.

14        Q.    So the kitchen window had a visual of the door of

15    the add-on or the opening of that add-on?

16        A.    That window had a -- basically, a visual of the

17    add-on storage area.

18        Q.    Which officer broke the window?    Or officers.

19        A.    I don't remember who exactly broke the window.

20        Q.    And which officers deployed -- which officer

21    deployed the Stinger Grenade, if you know?

22        A.    I don't remember who deployed the Stinger Grenade.

23        Q.    You deployed the Tomahawk?

24        A.    Yes, I did.

25        Q.    Was it at the same time as the Stinger Grenade?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      A.    Yes.

2          Q.    Did you guys come up with this plan in the kitchen,

3    or was it while you were in the detached garage?

4          MR. BRENTE:    So I'm going to object as assuming

5    facts not in evidence, that they came up with this plan.

6    BY MR. KIRAKOSIAN:

7          Q.    When you heard of about this plan, were you in the

8    detached garage or in the kitchen?

9          A.    It was in the detached garage.

10         Q.    Five or six of you walked into the kitchen.

11              Did you see anything in the kitchen?  Did you guys

12    look around at all to see if Mr. Soderberg was in the kitchen

13    or anything else was in the kitchen?

14              MR. GILBERT:    Compound.    Vague.

15              MR. BRENTE:    I assume you're talking about what they

16    would perceive to be a threat?

17    BY MR. KIRAKOSIAN:

18         Q.    Sure.  Anything relevant in the kitchen.

19         A.    Well, we knew the suspect was not in the kitchen.

20    We knew he was in the shed.  We quickly cleared the house

21    where we were just to make sure there was no other bodies or

22    anything quickly, but --

23         Q.    Who cleared the house?

24         A.    The officers that were inside.

25         Q.    So the five, six of you did?

Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.
Officer Mario Rios on 08/13/2019

```
 1     A.    Correct.

 2     Q.    Did you guys see any blood in the kitchen?

 3     A.    I did not observe any blood.

 4     Q.    When you cleared the house did you see a pistol

 5  anywhere?

 6     A.    I did not see a pistol.

 7     Q.    Did anyone call out that there was a pistol in the

 8  house?

 9     A.    No one observed a pistol that I heard, no.

10     Q.    What happened after you deployed the Tomahawk and

11  another officer deployed the Stinger Grenade?

12     A.    Within seconds I can hear the suspect yelling,

13  groaning.  The officer on the robot was stating that the

14  suspect is moving around.  He's starting to get up and that

15  he was exiting the shed.

16     Q.    Not the side of the shed that you threw the

17  Tomahawk?

18     A.    No.

19     Q.    The other side?

20           Can you tell me what a Stinger Grenade does?

21     A.    Stinger Grenade is a less-lethal ammunition that has

22  approximately 80 round, little bullets.

23     Q.    Rubber pellets?

24     A.    Rubber pellets.  And it's supposed to cause

25  discomfort for someone so they can hopefully give up,
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1                         CERTIFICATE

 2                             OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  August 13, 2019.

23

24                        Jinna Grace Kim, CSR No. 14151

25
```

# PLAINTIFFS' CITATIONS

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ESTATE OF ANTHONY SODERBERG, et al., )
                                          )
 5                 Plaintiffs,            )
                                          )
 6                 vs.                    ) Case No.
                                          ) 2:18-CV-3861-FMO-JPR
 7   LOS ANGELES POLICE DEPARTMENT, et al.,)
                                          )
 8                 Defendants.            )
     _____)
 9

10

11

12

13

14            DEPOSITION OF OFFICER MARIO RIOS

15                 LOS ANGELES, CALIFORNIA

16              TUESDAY, AUGUST 13, 2019

17

18

19

20

21

22

23

24   Reported by:  Jinna Grace Kim, CSR No. 14151

25   Job No.:  255908
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ESTATE OF ANTHONY SODERBERG, et al., )
                                         )
 5              Plaintiffs,              )
                                         )
 6         vs.                           ) Case No.
                                         ) 2:18-CV-3861-FMO-JPR
 7   LOS ANGELES POLICE DEPARTMENT, et al.,)
                                         )
 8              Defendants.              )
     _____)
 9

10

11

12

13

14         The deposition of OFFICER MARIO RIOS, taken on

15   behalf of the Plaintiffs, at 200 North Main Street, 6th

16   Floor, Los Angeles, California 90012, beginning at 9:09 a.m.,

17   and ending at 11:32 a.m., on Tuesday, August 13, 2019, before

18   Jinna Grace Kim, Certified Stenographic Shorthand Reporter

19   No. 14151.

20

21

22

23

24

25
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1       A.   It was in the air.

2       Q.   Okay.  But you could not see it?

3       A.   I cannot see where it was.

4       Q.   At this time Mr. Soderberg was in the doorway, or

5  just outside the doorway of the kitchen?

6       A.   He was just outside the doorway, right in front of

7  the doorway.

8       Q.   And he was facing out the side -- toward Side 2?

9            MR. BRENTE:  Toward Side 2?

10           MR. KIRAKOSIAN:  Yes.

11           THE WITNESS:  That's correct.

12           MR. BRENTE:  So you mean, at the house?

13           THE WITNESS:  He was outside of the kitchen door,

14  the main residence on Side 2, looking up in the air, pointing

15  his gun in the air.

16  BY MR. KIRAKOSIAN:

17       Q.   And he was pointing away from the house, or toward

18  the house?

19       A.   Away from the house.

20       Q.   I guess, toward the ravine?

21           MR. BRENTE:  Okay.  So I'm going to object as

22  misstating the witness's testimony.

23  BY MR. KIRAKOSIAN:

24       Q.   That's a question.

25       A.   He was pointing the -- his weapon up in the air in

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    the direction of the sky.

2         Q.    Okay.

3         A.    In northbound direction.

4         Q.    Thank you.  What happened next, if you recall, after

5    those gunshots?

6         A.    The suspect then retreated back inside the house.

7         Q.    Prior to this, had gas been used?

8         A.    I believe --

9              MR. GILBERT:  Foundation.

10   BY MR. KIRAKOSIAN:

11        Q.    Let me ask it another way.

12              When you saw that on the monitor, him kneeling, did

13   you have a gas mask on?

14        A.    Yes.  I believe I did.

15        Q.    Did you have your gas mask on after the use of

16   gas?

17              MR. BRENTE:  Okay.  That would call for speculation.

18              But you can answer.

19              THE WITNESS:  Yes.

20   BY MR. KIRAKOSIAN:

21        Q.    So prior to this, gas had been deployed into the

22   house?

23              MR. GILBERT:  Speculation.  Foundation --

24              MR. BRENTE:  Speculation.  Vague as to time.

25   BY MR. KIRAKOSIAN:

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      Q.   Prior to seeing Mr. Soderberg fire at the air, as

2   you testified, gas had been used; is that correct?

3           MR. GILBERT:  Speculation.  Foundation.

4           THE WITNESS:  I believe after the shots from inside

5   the house, gas started going inside the house.

6           So I would have my mask on.

7   BY MR. KIRAKOSIAN:

8      Q.   Do you know what gas was used?

9      A.   I believe at that time they were using the gas guns

10  with a Ferret rounds, so OC gas and CS gas canisters.

11     Q.   Do you know where they were deployed?

12          MR. BRENTE:  Okay.  So I'm going to object as -- are

13  you asking if he knows now?  If he knew that at the time?

14          What are you asking?

15  BY MR. KIRAKOSIAN:

16     Q.   I guess at the time.

17     A.   At the time I don't know exactly what side they were

18  being put in.  Just -- I guess any openings that they can

19  see, doorway, window.  Nothing on Side 2 because I can see

20  Side 2.

21     Q.   Did you not use any gas with the robot?

22          MR. GILBERT:  Vague --

23          MR. BRENTE:  Okay.  So I'm going to assume that the

24  robot can use gas.  So that lacks foundation, calls for

25  speculation.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    Q.   So that's what I was trying to find out.

2         He turned eastward first; correct?

3         He ran out north.  You saw his left side.

4         You couldn't see a gun in his left hand; is that

5    correct?

6         MR. BRENTE:  Okay.  So that misstates his

7    testimony.

8    BY MR. KIRAKOSIAN:

9    Q.   Is that correct?

10        MR. GILBERT:  Assumes facts he could see his left

11   side or his left hand.

12   BY MR. KIRAKOSIAN:

13   Q.   Is that correct?

14   A.   I could see his left side, and I did not see a gun

15   on his hand, in his left hand.

16   Q.   Okay.  Now, he starts turning eastward; is that

17   correct?

18   A.   Correct.

19   Q.   This is when he starts running?

20   A.   He was running the whole time.

21   Q.   Okay.  So now he turns eastward.

22        What part of his body do you see as he starts

23   running east?

24   A.   I see his back at first.

25   Q.   Okay.  Hold on before you get anywhere.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1       Q.    Can you describe the dark object?

2       A.    It was just a dark, black object in his right

3    hand.

4       Q.    Was it like a phone?  Was it like a ball?

5             Could you tell me what shape the object was?

6       A.    It wasn't -- it didn't look small like a phone.

7             It didn't look round like a ball.  It just looked

8    like a black object that he was holding in his hand.

9       Q.    So you can't tell me anything more with respect to

10   the shape of the object?

11      A.    No.

12      Q.    What happens once you see that dark object in his

13   right hand?

14            MR. BRENTE:  Okay.  So that's just out of context.

15            He testified to a sequence of events that occurred

16   before at the same time he saw the dark object.

17   BY MR. KIRAKOSIAN:

18      Q.    You can clarify what happened next.

19            MR. GILBERT:  Vague.

20            THE WITNESS:  Well, based on everything that had

21   happened, the gunshots from inside the house, his statements,

22   I observed him with a gun in his hand --

23   BY MR. KIRAKOSIAN:

24      Q.    Was it a gun, or was it a dark object?

25      A.    When I observed him with a gun earlier, outside the

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1          MR. GILBERT:  -- which piece of furniture are you

2     referring to?

3          THE WITNESS:  There was furniture outside in the

4     patio.  He did not have to run or jump over the furniture,

5     so.

6          MR. GALIPO:  Maybe we'll go for a few more minutes

7     and take a five-minute break?

8          Would that work for everyone?  Give our court

9     reporter a chance to take a breath?

10          MR. KIRAKOSIAN:  Yeah.  It's been an hour.

11          Do you want to take a break now?

12          MR. GALIPO:  Sure.  Let me take about a five-minute

13     break.

14          Does that work for everybody?

15          MR. BRENTE:  Yeah.

16          (Recess taken.)

17     BY MR. KIRAKOSIAN:

18     Q.   Sorry.  I'm going to go back to that time frame.

19          After observing what you had, you shot how many

20     times?

21     A.   Two times.

22     Q.   Do you know if you hit Mr. Soderberg?

23     A.   I believe I did, yes.

24     Q.   Where were you aiming?

25     A.   His right side.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1        Q.    Toward his right shoulder?  Or just the general

2    right torso area?

3        A.    Right torso area.

4        Q.    Assuming Mr. Soderberg had not turned toward you and

5    was just running, do you believe you could have fired at that

6    point?

7              MR. BRENTE:  Okay.  So that calls for speculation.

8    Lacks foundation.  Calls for a legal opinion --

9    BY MR. KIRAKOSIAN:

10       Q.    With respect to your training as an officer

11   and everything else --

12             MR. GILBERT:  Speculation.  Incomplete hypothetical.

13   Assumes facts.

14             If you can answer, go ahead.

15             MR. BRENTE:  Join.

16   BY MR. KIRAKOSIAN:

17       Q.    Do you understand the question?

18       A.    Yes.

19       Q.    Do you believe at that point in time you would have

20   been allowed to fire at Mr. Soderberg?

21             MR. GILBERT:  Same objections.

22             THE WITNESS:  I probably would not have fired at

23   Soderberg.

24   BY MR. KIRAKOSIAN:

25       Q.    And why not?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      A.   Well, he wouldn't be pointing an object at me that I

2    believed to be a gun.  So I wouldn't fear that he was going

3    to engage me or my fellow officers that were behind me.

4      Q.   What happens after you fire?

5           I think you said you believe you might have hit

6    him?

7      A.   The suspect went down.  He fell to the ground.

8      Q.   Did you fire with anybody else at that time?

9           MR. GILBERT:  Speculation.

10          MR. BRENTE:  Join.

11          THE WITNESS:  Officer Pultz, which was to my left,

12   fired also.

13   BY MR. KIRAKOSIAN:

14     Q.   Did you guys both fire at the exact same time?

15          MR. GILBERT:  Speculation.

16          MR. BRENTE:  Join.

17          THE WITNESS:  It appeared that it was around the

18   time same, yes.

19   BY MR. KIRAKOSIAN:

20     Q.   Then you said you saw him go down?

21     A.   He fell to the ground, yes.

22     Q.   How did he fall?

23     A.   He fell face first on his stomach.

24     Q.   And where was he at this point in time when he fell

25   down?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1       A.    He was pretty much at the edge, the eastern edge of

2   the court yard, behind the patio furniture.

3       Q.    Was he taking cover behind the patio furniture, or

4   was he just behind the patio furniture?

5       A.    When he fell down, I sort of lost sight of him a

6   little bit because he was on the ground.  As I took one or

7   two steps forward to get better visual of the suspect, I

8   could see him crawling to the side of the house and put his

9   back against the house, basically, sitting on the ground with

10  his back against the house, and he was behind some

11  furniture.

12      Q.    How close to the add-on was he when he was sitting

13  with his back against the --

14      A.    The add-on which would be the little, kind of closet

15  area, the little --

16      Q.    Yeah.

17      A.    He was -- it was to his right.

18      Q.    How far to his right?

19      A.    Probably a foot or two.

20      Q.    Is there, like, an opening in that add-on?

21      A.    Yes.

22      Q.    So now you have a visual on Mr. Soderberg sitting

23  with his back against the wall very close to the add-on; is

24  that fair?

25      A.    That's correct.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1  furniture which I cannot see, just the top of his head.

2  BY MR. KIRAKOSIAN:

3      Q.   So there was furniture that was up against that wall

4  as well?

5          MR. GILBERT:  Misstates testimony.

6  BY MR. KIRAKOSIAN:

7      Q.   You said he was behind furniture.

8          I'm just trying to --

9      A.   Yeah.  I don't know if it was behind or if it was

10  against the wall, but he was just -- from my visual, the

11  patio furniture was blocking my view of him because he was on

12  the ground, sitting down against the wall.

13     Q.   What happens next?  You could just see his face; is

14  that correct?

15     A.   Not even his face.  The top of his head, maybe the

16  top of his shoulders.

17     Q.   I'm sorry.  I'm going to just rewind a little bit.

18         Prior to you opening fire on Mr. Soderberg, did you

19  hear him say anything?

20     A.   I did not hear him say anything.

21     Q.   Did you say anything to him?

22     A.   No.

23     Q.   Now, we're back to you seeing his back against the

24  wall.

25         Do you start approaching him, or what do you do

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    next?

2        A.    I do start approaching him.  I take a few steps

3    forward to try to get a better visual on him.  At that time I

4    can hear the airship come around, and that's when the airship

5    had engaged the suspect.

6        Q.    Did he crawl to that position, to his back against

7    the wall?

8            Or did he fall down, stand up, and walk there?

9            MR. GILBERT:  Speculation --

10           MR. BRENTE:  Or something else.

11   BY MR. KIRAKOSIAN:

12       Q.    Or something else, yeah.

13           I'm trying to ask how did he get to that wall with

14   his back against the wall?

15       A.    He never stood up after that.  He basically crawled

16   to the back of the wall, positioned himself against the

17   wall.

18       Q.    Were you able to see him crawling?

19       A.    I can see parts of his body on the ground, crawling

20   to where he was.

21       Q.    Why do you say parts of his body?

22       A.    Well, because there was patio furniture on the

23   ground.  So he was covered by some of the furniture.

24       Q.    So some of the furniture was obstructing your view

25   as he's crawling to that position?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1     A.   After he fell to the ground, it did, yes.

2     Q.   I'm talking about when he's crawling.

3          Was -- was the furniture obstructing your view of

4   Mr. Soderberg as he's crawling?

5     A.   My complete view, yes.

6     Q.   At some point when he's crawling, do you see his

7   hands?

8     A.   No.

9     Q.   At some point when he's crawling, can you see his

10  legs?

11    A.   Yes.

12    Q.   At some point when he's crawling, can you see his

13  back?

14    A.   No.

15    Q.   At some point when he's crawling, can you see his

16  face?

17    A.   No.

18    Q.   Now, you see Mr. Soderberg sitting with his back

19  against the wall.

20         And you could only see the top of his head?

21    A.   Correct.

22    Q.   You said you heard the helicopter flying over?

23    A.   Yes.

24    Q.   Describe what happens next.

25    A.   That's when the officer from the helicopter engaged

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1   the suspect.

2   Q.   When you say, "Engaged," you mean, fire at?

3   A.   Correct.

4   Q.   When they're firing could you see Mr. Soderberg?

5   A.   No.

6   Q.   Could you still see the top of his head?

7   A.   Yes.

8   Q.   Anything else?

9   A.   No.

10   Q.   Did Mr. Soderberg say anything?

11   A.   I did not --

12        MR. BRENTE:  I'm going to object that he could

13   testify to what he heard.  He wouldn't know if he necessarily

14   said anything or not.

15        THE WITNESS:  I did not hear anything.

16   BY MR. KIRAKOSIAN:

17   Q.   Did you say anything to Mr. Soderberg at this

18   time?

19   A.   No.

20   Q.   You still had your gas mask on throughout this

21   period?

22   A.   Yes, I did.

23   Q.   Did you see the shots from the helicopter, or you

24   could only hear it?

25        MR. GILBERT:  Vague.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1          MR. BRENTE:  Join.

2          THE WITNESS:  I can hear the shots, and I can see

3    the shots hitting the ground near the suspect.

4    BY MR. KIRAKOSIAN:

5      Q.    Anything else happened at this time?

6          MR. BRENTE:  Objection.  Vague and ambiguous.

7          THE WITNESS:  At that time I re-positioned myself in

8    the doorway of the detached garage, and the suspect crawled

9    into that storage area.

10   BY MR. KIRAKOSIAN:

11     Q.    Did you see him crawling into the storage area?

12     A.    I can see parts of his body crawling into that

13   area.

14     Q.    When you fired at Mr. Soderberg from the doorway,

15   did you announce on the radio that you had opened fire?

16          MR. GILBERT:  Misstates testimony.

17          MR. BRENTE:  I'm going to object as argumentative,

18   "open fire."

19          MR. GILBERT:  There's no evidence or testimony that

20   he's opened fire.  It's also vague and ambiguous as phrased.

21          Go ahead.

22          THE WITNESS:  I did not say anything on the radio

23   after that.

24   BY MR. KIRAKOSIAN:

25     Q.    Do you know if Officer Pultz did?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1           Did you hear him call out on the radio that he had

2    opened fire?

3           MR. GILBERT:  Objection.  No evidence.  Vague and

4    ambiguous as to "open fire."  Also no evidence that any

5    officer opened fire.

6           Go ahead.

7    BY MR. KIRAKOSIAN:

8      Q.   Did you see Mr. Pultz also fire when you did?

9      A.   I did not see him.  He was right next to me.

10     Q.   But you know he did?

11     A.   Yes.

12     Q.   Did you hear him call out on the radio that he had

13    fired at Mr. Soderberg?

14     A.   No.

15     Q.   Now, you see him crawling to the detached -- sorry.

16          You see him crawling into the add-on or shed?

17     A.   Correct.

18     Q.   What happens next?

19          First, can you see any parts of his body while he's

20    in the shed?

21     A.   No.

22     Q.   Not his legs?

23     A.   Correct.

24     Q.   How do you know he's in the shed?

25     A.   I observed him crawling into that area.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      A.    It's the Stinger Grenade.

2      Q.    Is that the same thing?

3      A.    No.

4      Q.    Was part of the plan to also deploy a Tomahawk?

5            MR. GILBERT:  Vague as to time.

6            MR. BRENTE:  Join.

7    BY MR. KIRAKOSIAN:

8      Q.    As part of this plan that you just referenced, was

9    it to use a Stinger Grenade and a Tomahawk or hot gas or --

10     A.    No.  Not this plan.

11     Q.    Okay.  So tell me about this plan.

12     A.    So this plan was just to initiate and for me to

13   deploy a Stinger Grenade inside the shed area, to have the

14   suspect to comply and hopefully get him into custody.

15     Q.    Did you do that?

16     A.    Yes, I did.

17     Q.    And did you have a visual on Mr. Soderberg when you

18   did that?

19     A.    No.

20     Q.    Did the robot, as far as you know, have a visual on

21   Mr. Soderberg?

22     A.    Yes, it did.

23     Q.    Was someone calling out kind of play-by-play of what

24   they can see of Mr. Soderberg?

25     A.    Yes.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1        Q.    You were in the court yard when you deployed the

2    Stinger Grenade; is that correct?

3        A.    Yes.

4        Q.    And what happens next, as far as you know, once you

5    deploy the Stinger Grenade?

6        A.    After I deployed the Stinger Grenade we back up and

7    get cover.  The officer on the robot that's watching the

8    monitor stated that there was little effect to the suspect

9    and that he had looked back in the opening direction of the

10   shed to see if anybody was coming.

11           MR. BRENTE:  When you said, "He had looked back,"

12   who is the "he?"

13           THE WITNESS:  The suspect.

14   BY MR. KIRAKOSIAN:

15       Q.    Was he still on his stomach at this time?

16       A.    I cannot see him, but I believe the officer stated

17   that he's still on his stomach, and all he did was just look

18   back to see if anybody was coming in the shed.

19       Q.    So little movement from Mr. Soderberg, as far as you

20   know, after deployment of the Stinger Grenade?

21       A.    That's correct.

22       Q.    And what did they -- what's the plan after that?

23       A.    So the plan after that was to enter the residence.

24   The suspect was inside the shed, and there was a window right

25   above him.  So the plan was to enter the residence, break the

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    window above where the suspect was laying, and at that time

2    deploy a Stinger Grenade and deploy a Tomahawk gas

3    canister.

4         Q.   Did you go into the house?

5         A.   Yes.

6         Q.   Which part of the house did you enter?

7         A.   We entered through the kitchen door that was in the

8    court yard.

9         Q.   When you say, "we," who are you referring to?

10        A.   Well, myself and other officers that responded

11   inside the house.

12        Q.   How many of you were there?

13        A.   Approximately five or six.

14        Q.   So you, five or six officers, you all enter the

15   kitchen?

16        A.   That's correct.

17        Q.   How long were you in the kitchen before you deployed

18   the Stinger Grenade and the Tomahawk?

19        A.   Probably a minute.

20        Q.   And I don't know how this works, but did one of you,

21   like, quickly run out and break the window, or run back in,

22   or break in, and deploy the Stinger Grenade and Tomahawk?

23             How does that work?

24        A.   So the plan was from inside the house that we would

25   smash the window, at the same time drop Stinger Grenade, and

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

 1   deploy a Tomahawk through the window.

 2       Q.   So is the -- you broke the kitchen window?

 3           MR. BRENTE:  Okay.  So when you say, "you broke," I

 4   don't know that he's testified that he broke anything.

 5   BY MR. KIRAKOSIAN:

 6       Q.   Was the kitchen window broken at this time?

 7           MR. BRENTE:  Vague as to "this time."

 8           THE WITNESS:  Once we initiated the plan, the

 9   kitchen window was broken from inside the house.

10   BY MR. KIRAKOSIAN:

11       Q.   And from there the Stinger Grenade and Tomahawk

12   would be deployed?

13       A.   At the same time, correct.

14       Q.   So the kitchen window had a visual of the door of

15   the add-on or the opening of that add-on?

16       A.   That window had a -- basically, a visual of the

17   add-on storage area.

18       Q.   Which officer broke the window?  Or officers.

19       A.   I don't remember who exactly broke the window.

20       Q.   And which officers deployed -- which officer

21   deployed the Stinger Grenade, if you know?

22       A.   I don't remember who deployed the Stinger Grenade.

23       Q.   You deployed the Tomahawk?

24       A.   Yes, I did.

25       Q.   Was it at the same time as the Stinger Grenade?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1        A.    Yes.

2        Q.    Did you guys come up with this plan in the kitchen,

3    or was it while you were in the detached garage?

4              MR. BRENTE:  So I'm going to object as assuming

5    facts not in evidence, that they came up with this plan.

6    BY MR. KIRAKOSIAN:

7        Q.    When you heard of about this plan, were you in the

8    detached garage or in the kitchen?

9        A.    It was in the detached garage.

10       Q.    Five or six of you walked into the kitchen.

11             Did you see anything in the kitchen?  Did you guys

12   look around at all to see if Mr. Soderberg was in the kitchen

13   or anything else was in the kitchen?

14             MR. GILBERT:  Compound.  Vague.

15             MR. BRENTE:  I assume you're talking about what they

16   would perceive to be a threat?

17   BY MR. KIRAKOSIAN:

18       Q.    Sure.  Anything relevant in the kitchen.

19       A.    Well, we knew the suspect was not in the kitchen.

20   We knew he was in the shed.  We quickly cleared the house

21   where we were just to make sure there was no other bodies or

22   anything quickly, but --

23       Q.    Who cleared the house?

24       A.    The officers that were inside.

25       Q.    So the five, six of you did?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      A.    Correct.

2      Q.    Did you guys see any blood in the kitchen?

3      A.    I did not observe any blood.

4      Q.    When you cleared the house did you see a pistol

5  anywhere?

6      A.    I did not see a pistol.

7      Q.    Did anyone call out that there was a pistol in the

8  house?

9      A.    No one observed a pistol that I heard, no.

10      Q.    What happened after you deployed the Tomahawk and

11  another officer deployed the Stinger Grenade?

12      A.    Within seconds I can hear the suspect yelling,

13  groaning.  The officer on the robot was stating that the

14  suspect is moving around.  He's starting to get up and that

15  he was exiting the shed.

16      Q.    Not the side of the shed that you threw the

17  Tomahawk?

18      A.    No.

19      Q.    The other side?

20            Can you tell me what a Stinger Grenade does?

21      A.    Stinger Grenade is a less-lethal ammunition that has

22  approximately 80 round, little bullets.

23      Q.    Rubber pellets?

24      A.    Rubber pellets.  And it's supposed to cause

25  discomfort for someone so they can hopefully give up,

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    designed to affect someone's vision, someone's breathing,

2    little bit of irritation on the skin which are probably a

3    higher dose of the CS gas.

4        Q.    So CS gas -- or CS; is that right, CS gas?

5        A.    CS.

6        Q.    And what kind of gas is in the Tomahawk?

7        A.    I'm not quite sure exactly what type of gas.

8              I just know it's a little stronger than the Stinger

9    Grenade would be.

10       Q.    Does the Tomahawk have pellets as well?

11       A.    No, it doesn't.

12       Q.    It's just gas?

13       A.    The Tomahawk, itself, is just a canister that holds

14    the gas canister.  That's why they call it Tomahawk because

15    it looks like a Tomahawk.

16       Q.    Could you hear Mr. Soderberg screaming at this

17    time?

18       A.    Yes.

19       Q.    Was he saying anything that you can understand?

20       A.    No.  He just seemed like he was just -- he was in

21    discomfort and just yelling.

22       Q.    At this time did you throw a flashbang as well?

23       A.    No.

24       Q.    Did you see anyone throw a flashbang?

25       A.    No.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      Q.   Is that -- is flashbang a thing that SWAT officers

2   use?

3           MR. GILBERT:  Vague.  Overbroad.

4           THE WITNESS:  Yes.  We do have flashbangs, but there

5   was no flashbang deployed on that.

6   BY MR. KIRAKOSIAN:

7      Q.   Just the two Stinger Grenades and then the

8   Tomahawk --

9           MR. GILBERT:  Speculation and foundation --

10          MR. BRENTE:  -- join --

11  BY MR. KIRAKOSIAN:

12     Q.   -- that we discussed?

13     A.   That's correct.

14     Q.   Did you see Mr. Soderberg at any time when you had

15  deployed the Tomahawk after you deployed the Tomahawk?

16          MR. GILBERT:  During or after?

17  BY MR. KIRAKOSIAN:

18     Q.   I guess we're on that same time where you deployed

19  the Tomahawk?

20     A.   After he started screaming, you can hear him moving

21  around in the storage area, and I believe I saw a little bit

22  of his back as he was going out the door, but that's all I

23  saw.

24     Q.   What happened next, as far as you know?

25     A.   After he appeared to be exiting the opening of the

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    storage area, I heard several gunshots.  And shortly after

2    that I heard over the radio that suspect was down the ravine,

3    that he was over the wall and down the ravine.

4        Q.    Did you hear anything being called out on the radio

5    at this time when you heard the gunshots?

6        A.    No.

7        Q.    Did anyone call out they can see Mr. Soderberg?

8        A.    I just -- I believe the officer on the robot was

9    stating that he's coming out of the opening.

10            And that was about it.

11       Q.    Nobody said at this time, "He's got a gun."

12            Is that correct?

13            MR. BRENTE:  Okay.  Well, I'm just going to object.

14            You're asking him what he heard over the radio?

15   BY MR. KIRAKOSIAN:

16       Q.    At this time did you hear any officer say personally

17   or through the radio say, "He's coming out.  He's got a gun."

18            You did not hear that; correct?

19       A.    I don't remember hearing that.

20       Q.    And then you heard the -- you heard the gunshots?

21       A.    Correct.

22       Q.    How many gunshots do you remember hearing?

23       A.    I would say approximately two or three gunshots.

24       Q.    Did it sound like it was all from the same gun, or

25   did it sound like it was coming from different direction, if

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    the ravine?

2        A.    Yes.

3        Q.    As you approached the ravine, had you heard any

4    other gunshots at this time?

5        A.    No.

6            MR. GILBERT:    As he's approaching?

7            MR. KIRAKOSIAN:    Pretty much.

8            THE WITNESS:    No.

9    BY MR. KIRAKOSIAN:

10       Q.    After you get a visual on Mr. Soderberg in the

11   ravine, did you hear gunshots after that?

12       A.    Yes.

13       Q.    Can you describe what you saw Mr. Soderberg doing,

14   if anything, while he was in the ravine?

15       A.    When I got to the top looking down on the ravine, I

16   saw the suspect, like, in a kneeling position on his knees,

17   as kind of like a praying position.

18            He had his right hand under his chest, and his left

19   hand was out in front of him.  And again, it appeared that he

20   had something in his right hand.

21       Q.    So I'm trying to describe what I saw.

22            You tucked in your right arm, your elbow is kind of

23   touching your right rib, tucked under the chest --

24       A.    So when I observed the suspect it appeared that he

25   was on his knees as in a praying position.  His right arm was

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    tucked under his chest, and his left arm was out in front of

2    him.

3        Q.    Was his left arm bracing the ground?

4        A.    It appeared that it was, yes.

5        Q.    Could you see his face?

6        A.    Not a clear visual of his face, no.

7        Q.    Was it because he was faced down?

8        A.    He wasn't faced down.  He was basically like in a

9    kneeling position, not flat on his chest, not flat on his

10    face, like he was holding himself up in a kneeling position.

11        Q.    Did it look like he was looking down on the

12    ground?

13        MR. BRENTE:  I would object that would call for

14    speculation.

15    BY MR. KIRAKOSIAN:

16        Q.    Did it seem like he was looking down at the

17    ground?

18        MR. GILBERT:  Speculation.

19        THE WITNESS:  He was looking in a downward

20    position.

21    BY MR. KIRAKOSIAN:

22        Q.    Toward the ground?

23        A.    Toward the ground.

24        Q.    Could you see his chest at all?

25        A.    No.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1       Q.   How do you know his hand, his right hand, was tucked

 2   under his -- tucked in under his chest --

 3       A.   Well, it wasn't tucked in under his chest.

 4            It wasn't tucked under.  It was under his chest, and

 5   I can see his right hand.  I can see his right hand, and it

 6   appeared that something was in his hand.

 7            So his hand, his arm, his forearm was under his

 8   chest, but his hand was out with his left side.

 9       Q.   Was his forearm on the ground?

10       A.   Yes.

11       Q.   And so his hands would be across his body?

12            His right hand would be across his body, but on the

13   ground?

14       A.   Correct.

15       Q.   And what did it appear like he had in his hand?

16       A.   He appeared that he was holding a dark object in his

17   hand.

18       Q.   Can you describe that object?

19       A.   It was just -- I can see it was something black that

20   was in what appeared to be his right hand.  I couldn't see

21   his fingers.  It was just -- it seemed like he was holding

22   something black.

23            From my view, that's all I could see.

24       Q.   Was he palm-up when he was -- had his forearm on the

25   ground?
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    gunshots and shortly after that --

2    Q.    Before we move on, why didn't you fire at

3    Mr. Soderberg at this time?

4    A.    It was all within seconds.  I was still trying to

5    verify what exactly I was looking at, and within those

6    seconds I heard gunshots, and then basically no more movement

7    from the suspect.

8    Q.    None of the other officers around you that we were

9    talking about, the five or six officers, did you see any of

10    them fire at Mr. Soderberg?

11    A.    No.

12    Q.    Did you see anybody firing at Mr. Soderberg?

13    A.    No.

14    Q.    Do you know who fired at Soderberg at that time?

15    A.    I do not.

16    MR. GILBERT:  There was a couple of questions that

17    you cut him off.  He hasn't finished.  I'm assuming you

18    didn't want the answers for those couple questions back?

19    BY MR. KIRAKOSIAN:

20    Q.    After you heard the gunshots what happened?

21    A.    I believe there's just radio chatter, "Hey, suspect

22    moving."

23    Q.    Was that before the gunshot or after the gunshot?

24    A.    After.

25    Q.    Before the gunshot, was there any chatter?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1      Q.   Back on the record, Officer Rios.

2           You understand you're still under oath?

3      A.   Yes.

4      Q.   I just wanted to quickly go over a few little

5  things.

6           I want to go back to when you're in the doorway and

7  you have a visual on Mr. Soderberg.  This is just before you

8  fired upon Mr. Soderberg, okay, just to give you a reference

9  of time.

10          Do you know how far you were, if you can estimate,

11  between you and Mr. Soderberg when you fired?

12     A.   Probably 30 to 40 yards, estimate.

13     Q.   30 to 40 yards.

14          And you had your gas mask on at the time?

15     A.   Correct.

16     Q.   And were you inside or on the outside of the

17  doorway?

18     A.   I was in the doorway --

19          MR. GILBERT:  Vague as to "doorway."

20  BY MR. KIRAKOSIAN:

21     Q.   Do you understand doorway?

22          MR. GALIPO:  I think he answered.

23          THE WITNESS:  I was inside the doorway.

24  BY MR. KIRAKOSIAN:

25     Q.   Inside -- so on the inside of the garage as opposed

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    appropriate time to fire?

2          MR. GILBERT:  Incomplete hypothetical and

3    speculation.

4          Go ahead.

5          MR. BRENTE:  Join.

6          THE WITNESS:  With that situation based on those

7    facts, I don't believe I would have shot at the suspect at

8    that time.

9    BY MR. KIRAKOSIAN:

10       Q.   After you did open fire, he fell down; is that

11   correct?

12       A.   That's correct.

13       Q.   Were you able to see the object in his hand at this

14   time while he was on the ground?

15       A.   No.

16       Q.   Did you see anything in his hand at this time?

17          MR. GILBERT:  Assumes facts.  Assumes that he could

18   see the hands.

19          MR. BRENTE:  Join.

20          THE WITNESS:  Once he fell to the ground, I could

21   not see his hands.

22   BY MR. KIRAKOSIAN:

23       Q.   While he was crawling, did you see the object?

24          MR. GILBERT:  Assumes facts.

25          THE WITNESS:  No, I did not.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1   BY MR. KIRAKOSIAN:

 2        Q.   While he crawls and goes against the shed, could you

 3   see the weapon -- the dark object at any time as he's

 4   crawling?

 5             MR. GILBERT:  Assumes facts in that the officer can

 6   see his hands.

 7             MR. BRENTE:  Join.

 8             THE WITNESS:  I could not see his hands at that

 9   time.

10   BY MR. KIRAKOSIAN:

11        Q.   And you could not see the dark object as well?

12        A.   I could not see what he was holding in his hands at

13   all.

14        Q.   How do you know he was holding anything?

15        A.   I could not see his hands.

16        Q.   So you don't know if he was holding anything?

17        A.   I do not.

18        Q.   After the -- or while the shots are being fired from

19   the airplane -- sorry, the helicopter, could you see the

20   object in his hand?

21             MR. GILBERT:  Assumes facts that he could see the

22   suspect's hands --

23             MR. BRENTE:  -- and A, that he couldn't; B, that

24   that's where he was looking.

25             THE WITNESS:  At that time I could not see the
```

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    suspect's arms or hands.  I only had a visual of the top of

2    his head.

3    BY MR. KIRAKOSIAN:

4        Q.    At some point you kind of approached to do a Stinger

5    Grenade; is that correct?

6        A.    That's correct.

7        Q.    Do you see a dark object or the dark object that you

8    saw, did you see it anywhere on the ground or anywhere

9    else?

10        A.    No, I did not.

11        Q.    Other than in his hand, as you say you saw, did you

12    ever see that dark object at any time again outside of his

13    hand?

14        A.    No.

15        Q.    Did you end up ever determining what that dark

16    object was?

17        A.    No.

18        Q.    In your training as an officer, do they train you on

19    how to determine what a gun looks like versus what something

20    in his hand might be, might be a weapon?

21            Is there any training in that regard?

22            MR. GILBERT:  Vague.  Overbroad.

23            MR. BRENTE:  Join.

24            THE WITNESS:  We have training, academy training,

25    continuous training while you're learning on the job here in

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    BY MR. KIRAKOSIAN:

2        Q.   Tell me what that training is --

3            MR. GILBERT:  Overbroad.

4            THE WITNESS:  Just your observations on what you see

5    or what you believe is what that suspect is holding at the

6    time.

7    BY MR. KIRAKOSIAN:

8        Q.   When you deployed the gas, the Tomahawk gas, at that

9    point did you see the dark object anywhere in that vicinity,

10   around the shed, or in between the kitchen and the shed, or

11   outside the shed?

12           MR. GILBERT:  Vague.  Assumes facts that he could

13   see the suspect and anything in suspect's hands or around

14   it.

15           MR. BRENTE:  Join.

16   BY MR. KIRAKOSIAN:

17       Q.   Go ahead.

18       A.   I did not.

19       Q.   At some point did you learn that day that

20   Mr. Soderberg was unarmed in the shed or that add-on?

21       A.   That he was unarmed in the shed?

22       Q.   Correct.

23       A.   I don't remember hearing that.

24       Q.   At some point did you learn that when you opened

25   fire on Mr. Soderberg, that he was unarmed?

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1    was unarmed when he fell into the ravine?

2        A.    No.

3        Q.    How many statements did you give with respect to

4    this incident?

5            MR. BRENTE:  I'm going to object.

6            You mean, how many FID interviews?

7            MR. KIRAKOSIAN:  No.  Interviews in general.

8            THE WITNESS:  Just my FID interview.

9    BY MR. KIRAKOSIAN:

10       Q.    No one else interviewed you with respect to this

11   incident?

12           MR. BRENTE:  So you're obviously excluding his

13   counsel, I assume?

14   BY MR. KIRAKOSIAN:

15       Q.    Other than your attorney interviewing you, has

16   anyone else interviewed you?

17       A.    No.

18       Q.    Ultimately, did you learn that your conduct was

19   found to be outside of policy with respect to your shooting

20   upon Mr. Soderberg?

21           MR. GILBERT:  Objection.  Assumes facts.  Incomplete

22   hypothetical.  Calls for opinion testimony.

23           Go ahead.

24           THE WITNESS:  Through the Use of Force Review Board,

25   the Police Commission ruled the incident out of policy.

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

1          MR. GILBERT:  I think he's answered the question.

2          THE WITNESS:  That's what they ruled.

3          You know, I don't know exactly what they were

4    thinking or what they talked about.

5          That's what they came back in their ruling.

6    BY MR. KIRAKOSIAN:

7      Q.   No one's ever discussed the ruling with you before

8    other than your attorneys?

9      A.   I think just our attorneys.

10     Q.   Did you have to receive any additional training

11   after that ruling came out?

12     A.   I don't remember what kind of training.  I don't

13   remember.

14     Q.   Not specifically for being, you know, being found to

15   have acted outside policy.

16          No additional training with respect to that?

17     A.   I don't recall anything specific, no.

18     Q.   Any discipline for anything that occurred on that

19   date with respect to your conduct?

20     A.   No.

21     Q.   As you sit here today, have you ever read the

22   decision that holds your conduct to be outside of policy?

23          MR. GILBERT:  Vague as to "decision."

24          THE WITNESS:  The Police Commission hearing, yes.

25   BY MR. KIRAKOSIAN:

**Estate of Anthony Soderberg, et al. vs Los Angeles Police Department, et al.**
**Officer Mario Rios on 08/13/2019**

```
 1                          CERTIFICATE

 2                              OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  August 13, 2019.

23

24                          _____
                            Jinna Grace Kim, CSR No. 14151
25
```